IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA**,
*Appellant*,

*v.*

**CHRISTOPHER AREVALO**,
*Appellee.*

---

No. CR-19-0156-PR
Filed September 1, 2020

---

Appeal from the Superior Court in Maricopa County
The Honorable Michael D. Gordon, Judge
Nos.  CR2017-117321-001; CR2017-002116-001
**AFFIRMED AND REMANDED**

Memorandum Decision of the Court of Appeals
Division One
Nos. 1-CA-CR 18-0298; 1 CA-CR-19-0299
Filed Apr. 4, 2019
**VACATED**

---

COUNSEL:

Allister R. Adel, Maricopa County Attorney, Daniel Strange (argued),
Deputy County Attorney, Phoenix, Attorneys for State of Arizona

James J. Haas, Maricopa County Public Defender, Mikel Steinfeld
(argued), Deputy Public Defender, Phoenix, Attorneys for Christopher
Arevalo

David J. Euchner, Pima County Public Defender's Office, Tucson; and
John F. Sullivan, Chandler, Attorneys for Amicus Curiae Arizona
Attorneys for Criminal Justice

---

JUSTICE LOPEZ authored the opinion of the Court, in which CHIEF
JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES

GOULD and BEENE joined. JUSTICE BOLICK, joined by JUSTICE PELANDER (Retired),* concurred.

_____

JUSTICE LOPEZ, opinion of the Court:

¶1        We consider whether A.R.S. § 13-1202(B)(2), which enhances the sentence for threatening or intimidating if the defendant is a criminal street gang member, is constitutional. We hold that it is not because it increases a criminal sentence based solely upon gang status in violation of substantive due process.

## BACKGROUND

¶2        The charges against defendant Christopher Arevalo arise from two distinct cases. First, as alleged, on March 4, 2017, Arevalo entered a convenience store, was asked to leave by an employee who recognized him from prior shoplifting incidents, and grabbed a bag of peanuts and a soda without paying. As he was leaving, Arevalo gestured towards the employee and the store manager, mimicked holding a firearm, and vocalized gunfire noises. Arevalo did not mention any gang affiliation during the encounter. The employee and manager later told the police they believed Arevalo was a criminal street gang member and felt threatened by his behavior. After his arrest, Arevalo told officers he stole the items and, when questioned about gang membership, admitted he was a gang member. He explained he was a member of a street gang in Los Angeles and that he began associating with a local gang after moving to Arizona. Arevalo was indicted for two counts of threatening or intimidating in violation of § 13-1202(B)(2).

¶3        Then, on April 14, 2017, Arevalo's father called 911 after Arevalo became aggressive during a family dispute. When police arrived, Arevalo was hiding in a bedroom and told police to leave. Arevalo threatened one officer, vowing to "bash his head" if the officer entered the

_____

* Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable John Pelander, Justice of the Arizona Supreme Court (Retired), was designated to sit in this matter.

room. Several officers eventually entered the room, wherein Arevalo threatened them with a tire iron. Arevalo was arrested and charged with two counts of threatening or intimidating in violation of § 13-1202(B)(2).

¶4 Under § 13-1202(B)(2), a defendant receives an enhanced sentence if convicted of threatening or intimidating—a class 6 felony rather than a class 1 misdemeanor—if he is a criminal street gang member. The State, however, did not allege a nexus between Arevalo's charged conduct and his gang membership.

¶5 Arevalo moved to dismiss all threatening or intimidating charges, or alternatively to reduce them to class 1 misdemeanors, arguing that § 13-1202(B)(2)'s sentencing enhancement for mere gang membership is unconstitutional. The trial court dismissed all threatening or intimidating charges, ruling that § 13-1202(B)(2) is unconstitutional because it violates due process by punishing a defendant solely for gang membership or association.

¶6 The State appealed both cases and the court of appeals consolidated the appeals. The court analyzed Arevalo's claims under substantive due process, equal protection, and First Amendment free speech and associational rights. *See State v. Arevalo*, Nos. 1 CA-CR 18-0298, 1 CA-CR 18-0299, 2019 WL 1509879 (Ariz. App. Apr. 4, 2019) (mem. decision). The court rejected each argument, reversing the trial court's order and remanding the case. *Id.* at *3 ¶ 11.

¶7 We granted review to determine the constitutionality of § 13-1202(B)(2)'s sentencing enhancement for membership in a criminal street gang—a recurring issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## DISCUSSION

¶8 Arevalo argues that § 13-1202(B)(2) violates the Due Process Clause by punishing mere association in a gang. We agree. The court of appeals addressed the constitutionality of § 13-1202(B)(2) under the Due Process and Equal Protection Clauses, and the First Amendment. But, because we conclude the statute violates substantive due process, we do not

address Arevalo's equal protection and First Amendment claims, which he has not urged in this Court.

## A.

¶9        We review the constitutionality of statutes de novo.  *State v. Holle*, 240 Ariz. 300, 302 ¶ 8 (2016).  "An act of the legislature is presumed constitutional, and where there is a reasonable, even though debatable, basis for enactment of the statute, the act will be upheld unless it is clearly unconstitutional."  *State v. Ramos*, 133 Ariz. 4, 6 (1982); *see Gomez v. United States*, 490 U.S. 858, 864 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question."); *cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 247–51 (2012) (the "constitutional-doubt" canon rests "upon a judicial policy of not interpreting ambiguous statutes to flirt with constitutionality, thereby minimizing judicial conflicts with the legislature").  Because there is a strong presumption in favor of a statute's constitutionality, the challenging party bears the burden of proving its unconstitutionality.  *See Eastin v. Broomfield*, 116 Ariz. 578, 580 (1977).  The presumption of constitutionality may require us to interpret a statute to give it a constitutional construction if possible, but we will not rewrite a statute to save it.  *See, e.g.*, *Holle*, 240 Ariz. at 310 ¶ 47 (reiterating that courts may not rewrite a statute to avoid an alleged constitutional flaw).

¶10        A party raising a facial challenge to a statute "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) ("Under the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a 'law is unconstitutional in all of its applications.'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008))); *Stanwitz v. Reagan*, 245 Ariz. 344, 349 ¶ 19 (2018) (to same effect).

## B.

¶11        The Fourteenth Amendment to the United States Constitution, and article 2, section 4 of the Arizona Constitution, protect a citizen's right to "due process of law."  U.S. Const. amend. XIV, § 1 ("[N]or shall any state deprive any person of life, liberty, or property, without due

process of law."); Ariz. Const. art. 2, § 4 ("No person shall be deprived of life, liberty, or property without due process of law."). "Substantive due process protects an individual from government interference with rights implicit in the concept of ordered liberty . . . ." *Samiuddin v. Nothwehr*, 243 Ariz. 204, 209 ¶ 13 (2017) (quoting *Simpson v. Owens*, 207 Ariz. 261, 267 ¶ 17 (App. 2004)). The United States Supreme Court has explained that the substantive due process standard for permissibly criminalizing associational status requires a substantial nexus between the status and underlying criminal charge:

> [G]uilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity . . . that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause . . . .

*Scales v. United States*, 367 U.S. 203, 224–25 (1961).

¶12 In *Scales*, the defendant was charged under the Smith Act, 18 U.S.C. § 2385, which criminalized "the acquisition or holding of knowing membership in any organization which advocates the overthrow of the Government of the United States by force or violence." *Id.* at 205–06. The indictment alleged that the defendant was a member of the Communist Party of the United States and had "knowledge of the Party's illegal purpose and a specific intent" to overthrow the government. *Id.* The defendant challenged the statute's constitutionality, in part, on due process grounds because "it impermissibly impute[d] guilt to an individual merely on the basis of his associations and sympathies, rather than because of some concrete personal involvement in criminal conduct." *Id.* at 220.

¶13 The Court distilled the constitutional inquiry to "an analysis of the relationship between the fact of membership and the underlying substantive illegal conduct, in order to determine whether that relationship is indeed too tenuous to permit its use as the basis of criminal liability." *Id.* at 226. In the context of the Smith Act's criminalization of Communist Party membership, the Court reasoned that due process is satisfied only if the statute was applied to "'active' members" who have a "guilty knowledge and intent." *Id.* at 228. The Court declined to recognize "[m]embership, without more, in an organization engaged in illegal advocacy," as a

sufficient nexus between association and criminal activity to satisfy the concept of personal guilt under the due process clause. *Id.* at 225–27.

**¶14** We extract from *Scales* the principle that due process allows criminalization of membership in an organization only if such status has a sufficient connection, or nexus, to the underlying criminal conduct. We also import *Scales*' qualitative standard, even though it predates the three-tiered scrutiny level analysis the Supreme Court later adopted, because the relationship between associational membership and the underlying criminal conduct "must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause." 367 U.S. at 225.

**¶15** Under the three-tiered scrutiny level analysis, we apply one of three standards of review ranging from strict to intermediate scrutiny to rational basis review, depending on the right impacted, to assess a statute's constitutionality. *See, e.g., Craig v. Boren*, 429 U.S. 190, 197 (1976) (establishing intermediate scrutiny); *McGowan v. Maryland*, 366 U.S. 420, 425–26, 449 (1961) (discussing rational basis and strict scrutiny review). Strict scrutiny applies to a statute that implicates fundamental rights or a suspect class. *Ariz. Downs v. Ariz. Horsemen's Found.*, 130 Ariz. 550, 555 (1981). We will uphold a statute under strict scrutiny only if it is necessary to promote a compelling state interest and the statutory restriction is narrowly tailored. *Simpson v. Miller*, 241 Ariz. 341, 347 ¶ 22 (2017). Intermediate scrutiny applies in a narrower set of circumstances to statutes that affect categories such as gender and illegitimacy of birth. *See Simat Corp. v. Ariz. Health Care Cost Containment Sys.*, 203 Ariz. 454, 458 ¶ 15 (2002). A statute will survive intermediate scrutiny if a court finds the interests served by the government action are important and the state's means to achieve the goals are "reasonable, not arbitrary, and have a fair relation to those goals." *Id.* Finally, rational basis review applies if a statute does not implicate a fundamental right or a suspect class. *Ariz. Downs*, 130 Ariz. at 555. The statute will survive a due process challenge under the rational basis standard if it "has any conceivable rational basis to further a legitimate governmental interest." *Id.* Here, we conclude that § 13-1202(B)(2) fails even rational basis review—and therefore we need not analyze whether the statute meets strict or intermediate scrutiny—because it does not require a nexus between threatening or intimidating and gang membership.

**C.**

**¶16** We turn now to § 13-1202(B)(2), which enhances criminal penalties for threatening or intimidating if a defendant is a member of a criminal street gang:

> B. Threatening or intimidating pursuant to subsection A, paragraph 1 or 2 is a class 1 misdemeanor, except that it is a class 6 felony if:
>
> . . . .
>
> 2. The person is a criminal street gang member.

**¶17** The court of appeals acknowledged *Scales*' due process requirement that guilt be personal but reasoned that § 13-1202(B)(2) satisfies this standard because it "does not penalize mere membership in a criminal street gang—it penalizes the added menace inflicted when a criminal street gang member is engaged in criminal conduct." *Arevalo*, 2019 WL 1509879 at *2 ¶ 7 (quoting *State v. Meeds*, 244 Ariz. 454, 465 ¶ 32 (App. 2018)). Based on *Meeds*' reasoning alone, the court concluded that "the statute does not implicate the constitutional considerations in *Scales* and properly relies on personal guilt." *Id.* But the court's analysis fails to meaningfully address the core issue in this case—whether a sentencing enhancement based solely on gang membership, which is all the statute requires, rather than *Meeds*' interpretation, which imported an "added menace" criterion, constitutes a sufficient nexus with the underlying crime. Thus, by relying on *Meeds*, the court of appeals circumvented the requisite due process inquiry.

**¶18** The State argues that "the increased risk of violence when threats or intimidation [are] done by a gang member, versus a non-gang member . . . is the nexus the Court of Appeals referenced when it concluded [§] 13-1202(B)(2) does not penalize mere membership in a street gang." The State reasons that there only "needs to be a relationship between the gang status and the crime of threatening and intimidating that is sufficient to permit gang membership's use as the basis of criminal liability," rather than a direct correlation between an individual's gang membership and the purpose of his actual threats. We disagree.

**¶19** Although a gang member's proclamation of membership, when it accompanies the crime of threatening or intimidating, might provide a sufficient nexus between membership and the crime to justify enhanced punishment, a theoretical or abstract connection between the two fails to satisfy *Scales*' due process standard because "the relationship between the fact of membership and the underlying substantive illegal conduct" must be sufficiently substantial to warrant punishment. *See Scales*, 367 U.S. at 226. A non-gang member's threat is indistinguishable from that of a gang member if the threat is not bolstered—or connected—by gang membership. The flaw in the State's argument is that it sanctions what due process forbids—punishment based solely on associational status.

**¶20** We hold that § 13-1202(B)(2) violates *Scales*' due process standard because it enhances criminal penalties based solely on gang status without a sufficient nexus between gang membership and the underlying crime of threatening or intimidating. Indeed, it permits sentencing enhancement based on gang status even if the crime is wholly unrelated to a defendant's gang membership. An example is illustrative. Assume a teenager is, unbeknownst to his mother, a gang member. In the midst of a domestic disturbance, he threatens to strike his mother and is subsequently charged with threatening or intimidating. Under the State's argument and the court of appeals' reasoning, the defendant would be subject to a (B)(2) sentencing enhancement for gang membership even though his mother was unaware of his affiliation, he never invoked it to bolster his threat, and the crime was altogether unrelated to his gang activity. And even if the mother knew of her son's gang membership, the State would not have to prove that knowledge or otherwise relate his membership to the offense to invoke (B)(2)'s enhancement. By its terms, § 13-1202(B)(2) permits sentencing enhancement absent *any* nexus between gang membership and the crime. The absence of a nexus requirement between gang status and the crime of threatening or intimidating renders the statute facially invalid under *Salerno* because no application comports with constitutional standards. *See* 481 U.S. at 745. We cannot, and will not, rewrite the statute to save it. *See Holle*, 240 Ariz. at 310 ¶ 47.

**¶21** The statute in *Scales* criminalized organizational membership whereas § 13-1202(B)(2) enhances a sentence, based on gang membership, for an underlying personal crime. But, as the State conceded at argument, this distinction is immaterial. *Scales*' "personal guilt" or "nexus" due

process requirement applies with equal force to substantive offenses and sentencing enhancements. *See, e.g.*, *State v. Bonds*, 502 S.W.3d 118, 154–58 (Tenn. Crim. App. 2016) (finding unconstitutional a statute enhancing criminal sentences for gang members without requiring a nexus between gang status and the underlying crime); *State v. O.C.*, 748 So. 2d 945, 950 (Fla. 1999) (same); *cf. State v. Woodbridge*, 791 N.E.2d 1035, 1041 ¶ 40 (Ohio Ct. App. 2003) (upholding the constitutionality of a statute against challenges of vagueness and overbreadth because it explicitly punished conduct, not association, as it required a nexus between gang status and criminal activity).

**D.**

**¶22**        The expansive definition of "criminal street gang" in A.R.S. § 13-105(8) reinforces our holding requiring a nexus between gang membership and the underlying crime as a precondition for enhancing punishment for gang status.  Under the statute's definition, "'[c]riminal street gang' means an ongoing formal or informal association of persons in which members or associates individually or collectively engage in the commission, attempted commission, facilitation or solicitation of any felony act and that has at least one individual who is a criminal street gang member." *Id.*  The definition's breadth invites its sweeping application, and it presents a substantial risk that the (B)(2) sentencing enhancement will apply without a sufficient nexus between gang membership and the underlying crime.  Indeed, our courts have recognized the statute's purpose to punish gang members without any inquiry as to the relationship between a threat and gang status.  *See, e.g.*, *State v. Cooper*, Nos. 1 CA-CR 16-0869, No. 1 CA-CR 17-0502, 2018 WL 6217090, at *3 ¶ 10 (Ariz. App. Nov. 29, 2018) (mem. decision) ("[T]he purpose [of § 13-1202(B)(2)] is to punish gang members with a felony conviction if they threaten or intimidate anyone, regardless of the circumstances.").

**¶23**        The statutory structure of § 13-1202 further dispels the notion that (B)(2) serves any purpose other than to enhance punishment based solely on gang status.  Section 13-1202(A)(3) provides:

> A person commits threatening or intimidating if the person threatens or intimidates by word or conduct: . . . [t]o cause physical injury to another person or damage to the property of another in order to promote, further or assist in the interests

of or to cause, induce or solicit another person to participate
in a criminal street gang . . . .

A violation of (A)(3) is a class 3 felony pursuant to § 13-1202(C). Section (A)(3) evinces the legislature's intent to justify an enhanced sentence for threatening or intimidating when a sufficient nexus exists between a defendant's gang membership and the underlying crime. By contrast, other than its impermissible purpose to penalize mere gang membership, any constitutional application of (B)(2) would render the provision superfluous because a violation of (A)(3) would, in most instances, subsume it.

¶24 We note that courts in other jurisdictions have held similar statutes unconstitutional as violative of due process if they penalize gang membership without requiring a nexus between gang status and the underlying crime. We find *O.C.* and *Bonds* illustrative and persuasive. In *O.C.*, the Florida Supreme Court invalidated a statute that enhanced penalties "[u]pon a finding by the court at sentencing that the defendant is a member of a criminal street gang" because the statute did not require a nexus and lacked a "'reasonable and substantial relation' to a permissible legislative objective." 748 So. 2d at 947, 950 (citation omitted) (emphasis omitted); *see id.* at 950 ("[T]he statute punishes gang membership without requiring any nexus between the criminal activity and gang membership [and thus] lacks a rational relationship to the legislative goal of reducing gang violence or activity . . . .").

¶25 Similarly, in *Bonds*, the Tennessee Court of Criminal Appeals examined a statute that stated, in relevant part, that "[a] criminal gang offense committed by a defendant who was a criminal gang member at the time of the offense shall be punished one (1) classification higher than the classification established by the specific statute creating the offense committed." 502 S.W.3d at 147. The defendants challenged the statute as a violation of substantive due process because it "lack[ed] a nexus between gang membership and criminal conduct." *Id.* at 154. The court held the subsection unconstitutional as it was "completely devoid of language requiring that the underlying offense be somehow gang-related." *Id.* at 157. Consequently, like § 13-1202(B)(2), the statute impermissibly enhanced the defendant's punishment solely for his association with a gang. *Id.* at 158.

**E.**

**¶26**  The court of appeals declined to revisit its decision in *Meeds* and, instead, embraced its reasoning. In *Meeds*, the court addressed a similar constitutional challenge to § 13-1202(B)(2). There, the defendant repeatedly threatened his girlfriend, including sending menacing text messages, visiting her workplace, and threatening to "shoot up" her house or set it on fire. 244 Ariz. at 458–59 ¶¶ 2–3. At trial, the victim testified that she believed Meeds was a gang member, saw him with other gang members, and heard him reference his gang affiliation. *Id.* at 459 ¶ 5. Meeds was convicted under § 13-1202(B)(2) and received an enhanced sentence based on his gang membership. *Id.* at 459–60 ¶ 8. On appeal, Meeds challenged § 13-1202(B)(2) on grounds of vagueness and overbreadth, arguing it impinged on the First Amendment right to association. *Id.* at 462 ¶ 21. The court of appeals rejected Meeds' First Amendment challenge, concluding that the statute serves a compelling state interest "to protect the public from threats and intimidation by members of criminal street gangs, who presumably have a much greater ability than non-gang members to make good on those threats." *Id.* at 465 ¶ 32. The court reasoned that "[§] 13-1202(B)(2) does not penalize mere membership in a criminal street gang—it penalizes the added menace inflicted when a criminal street gang member is engaged in criminal conduct." *Id.* (citing *Callanan v. United States*, 364 U.S. 587, 593 (1961)).

**¶27**  Although *Meeds* considered First Amendment vagueness and overbreadth challenges to the statute—issues not raised here—we disavow it to the extent the court mischaracterized the statute's requirements by concluding it "does not penalize mere membership in a criminal street gang—it penalizes the added menace inflicted when a criminal street gang member is engaged in criminal conduct." *Id.* It may be true that the policy animating (B)(2)'s enactment is to confront what is presumed to be "the added menace inflicted when a criminal street gang member is engaged in criminal conduct," but the statute's text does precisely what *Meeds* says it does not—it penalizes mere membership in a criminal street gang.

**CONCLUSION**

**¶28**  We vacate the court of appeals' decision, affirm the trial court's ruling, and remand to the trial court for further proceedings.

11

BOLICK, J., joined by PELANDER, J. (Retired), concurring:

**¶29**    I join fully the Court's well-reasoned opinion.  In addition to the substantive issues addressed by the Court, Arevalo made arguments regarding the proper application of the presumption of statutory constitutionality.   I write separately because I would discard that presumption.

**¶30**    It is essential to our system of justice, and to its endurance, that every person enter the courtroom on a level playing field.  Sometimes our rules of procedure provide a momentary advantage to one side or the other, but ideally the law is blind to the identity, power, and resources of the litigants.  All of that is represented by the most ubiquitous symbol of the American judicial system, the scales of justice. They are, by their nature and necessity, evenly balanced.  But when a litigant, whether in a criminal or civil context, argues that a law that diminishes liberty is unconstitutional, the scales are tipped by the presumption of constitutionality in favor of the government.   Although this presumption is deeply rooted in our jurisprudence, it is antithetical to the most fundamental of ideals: that our constitutions are intended primarily not to shelter government power, but to protect individual liberty.

**¶31**    Although Arizona courts adopted the presumption of constitutionality from federal jurisprudence, it is more pronounced here than at the national level.  As this Court has applied it over the years, the presumption and the burden to overcome it can be heavy.  A constitutional attack upon a statute triggers several "cardinal rules."  *Giss v. Jordan*, 82 Ariz. 152, 158 (1957).  First, that the "[b]urden is on him who attacks constitutionality of legislation."  *Id.*  Second, "[g]enerally, every legislative act is presumed to be constitutional and every intendment must be indulged in by the courts in favor of validity of such an act."  *Id.* at 159. Third, the Court "will not declare a legislative act unconstitutional unless satisfied beyond a reasonable doubt of its unconstitutionality."  *Id.*; *see also Smith v. Mahoney*, 22 Ariz. 342, 346 (1921) ("[I]t is our bounden duty to view the legislative enactment under consideration . . . and sustain it, unless we are convinced beyond reasonable doubt that it is clearly in conflict with the constitutional provision.").  Indeed, an early decision went so far as to say that the burden on a party challenging the constitutionality of a statute is of "as great a weight of evidence and reasoning as would be required to be

presented by the state to convict a defendant of murder." *State v. Davey*, 27 Ariz. 254, 258 (1925).

¶**32**        This Court has recognized problems with the presumption over the years and has trimmed its sails a bit.  For instance, the Court disapproved the "beyond a reasonable doubt" standard because "[d]etermining constitutionality is a question of law, which we review de novo," and this inquiry "fundamentally differs from determining the existence of historical facts, the determination of which is subject to deference." *Gallardo v. State*, 236 Ariz. 84, 87 ¶ 8 (2014).[1] Likewise, the Court has declared that "if a law burdens fundamental rights, such as free speech or freedom of religion, any presumption in its favor falls away." *Id.* ¶ 9. Despite that constructive step, the Court attached the presumption's application to a fundamental-rights rubric that is at once familiar, yet amorphous as to which side of the line a particular right resides.  And although the Court held that the presumption should "fall away" in matters pertaining to such fundamental rights, it added that the presumption should remain intact when "the law in question touches only peripherally" on such rights. *Id.*  In this case, the Court does not confront those nuances, perhaps because it is not clear from this amorphous framework when the Court should place its thumb on the scale in favor of the government.

¶**33**        The rationale for the presumption of constitutionality is two-fold:  that because other public officials have all taken an oath to the constitution, courts should assume as a matter of comity that they have acted in accordance with the oath; and that without such a presumption, courts might transgress upon the legislature's powers on the basis of policy disagreements.  The United States Supreme Court has explained that "[a] decent respect for a co-ordinate branch of the government demands that the judiciary should presume, until the contrary is clearly shown, that there has been no transgression of power by Congress—all the members of which act

---

[1] Although the Court has abandoned the "beyond a reasonable doubt" standard, it still erroneously appears in the Arizona trial handbook. *See Ariz. Prac. Trial Handbook* § 12:11 (2018 update) ("To overcome the presumption in favor of the constitutionality of statutes, the opposing party has the burden of establishing beyond a reasonable doubt that the statute is in conflict with the federal or state constitution.").

under the obligation of an oath of fidelity to the Constitution." *Legal Tender Cases*, 79 U.S. 457, 531 (1870), *abrogated on other grounds by Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002); *see also United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.").

¶34 Similar rationales have informed Arizona jurisprudence. "The Arizona Legislature is vested with the legislative power of the state, and has plenary power to deal with any subject within the scope of civil government unless it is restrained by the provisions of the Constitution." *Giss*, 82 Ariz. at 159; *accord State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 595 ¶ 27 (2017). Moreover, "questions of the wisdom, justice, policy or expediency of a statute are for the legislature alone." *Giss*, 82 Ariz. at 159.

¶35 I agree with the propositions expressed in *Giss*, but they do not support a presumption of constitutionality. Neither the federal nor state constitution suggests an elevation of legislative or executive power over individual rights. To the contrary, both constitutions establish the protection of individual rights as a core purpose. *See, e.g.*, U.S. Const. Preamble (establishing the Constitution "to . . . secure the Blessings of Liberty to ourselves and our Posterity"); Ariz. Const. art. 2, § 2 ("[G]overnments . . . are established to protect and maintain individual rights."). Indeed, our constitutionally mandated separation of powers, proclaimed in article 3, "is part of an overall constitutional scheme to protect individual rights." *State v. Prentiss*, 163 Ariz. 81, 84 (1989). These purposes, conjoined with express guarantees of individual rights in the Bill of Rights and Arizona's Declaration of Rights, undermine any notion that courts should presume that laws infringing individual rights are constitutional.

¶36 Indeed, the role of the independent judiciary in our constitutional system is to protect individual rights by ensuring that the political branches do not exceed their constitutionally assigned authority. As Alexander Hamilton explained in *The Federalist*, "the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority." *The Federalist* No. 78, at 142 (Richard Beeman

ed., 2012). Without the independent judgment of the judiciary, he declared, "all the reservations of particular rights or privileges would amount to nothing." *Id.* at 141.

¶37 This view of the framers became the bulwark of American jurisprudence in *Marbury v. Madison*. There the Court famously declared that "it is emphatically the province and the duty of the judicial department to say what the law is," and thus the courts cannot simply "close their eyes" to laws that violate the Constitution. 5 U.S. 137, 177, 179 (1803); *accord Ariz. Indep. Redistricting Comm'n v. Brewer*, 229 Ariz. 347, 355 ¶ 34 (2012) ("The interpretation of the laws is the proper and peculiar province of the courts" and a "constitution is . . . and must be regarded by the judges [] as fundamental law.") (quoting *The Federalist* No. 78); *see also Cronin v. Sheldon*, 195 Ariz. 531, 538 ¶¶ 30–32 (1999) (asserting the judiciary's constitutional role in interpreting the law); Antonin Scalia & Bryan G. Garner, *Reading Law: The Interpretation of Legal Texts* 243 (2012) ("In the American system of separate and coequal powers, authoritative interpretation of the laws is the assigned role of the courts."). A contrary view of the judiciary's constitutional authority "would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits." *Marbury*, 5 U.S. at 178.

¶38 The role of judicial review articulated by *Marbury* leaves no room for the presumption that the legislature acts constitutionally. *See, e.g.*, Gary Lawson, *Thayer Versus Marshall*, 88 Nw. U. L. Rev. 221, 224–25 (1993). It is true that members of all three branches take constitutional oaths and thereby are obliged to act constitutionally. But their respective roles require the courts to serve as the ultimate arbiter, especially when it comes to the legislative body, which by its nature advances the views of the majority and resolves competing interests. As James Madison remarked, "[i]t is in vain to say that enlightened statesmen will be able to adjust these clashing interests, and render them all subservient to the public good." *The Federalist* No. 10, at 27 (Richard Beeman ed., 2012). Moreover, he warned, "a body of men are unfit to be both judges and parties at the same time," yet legislators who enact laws "concerning the rights of large bodies of citizens" are "advocates and parties to the causes which they determine[.]" *Id.* at 26–27.

¶39 Given the competing interests asserted in the legislative process, Madison proclaimed: "Justice ought to hold the balance between

them." *Id.* at 27. Specifically, "[t]he prescriptions in favor of liberty ought to be levelled against that quarter where the greatest danger lies," Madison argued, namely, "the body of the people, operating by the majority against the minority." James Madison, Speech Proposing Amendments to the Constitution (June 8, 1789). Thus, as this Court has recognized, "it is well settled that when one with standing challenges a duly enacted law on constitutional grounds, the judiciary is the department to resolve the issue even though promulgation and approval of statutes are constitutionally committed to the other two political branches." *Ariz. Indep. Redistricting Comm'n*, 229 Ariz. at 355 ¶ 34 (citing *Marbury*, 5 U.S. at 177); *accord Forty-Seventh Legislature v. Napolitano*, 213 Ariz. 482, 485 ¶ 8 (2006) ("Although each branch of government must apply and uphold the constitution, our courts bear ultimate responsibility for interpreting its provisions.").

¶40        We can preserve the broad authority conferred by the constitution upon the legislature without diminishing the essential role of the judiciary by strictly observing essential boundaries and limits on judicial authority, some of which are expressly recognized in the Court's opinion today. The courts should never substitute their policy judgments for those of the legislature, *see Giss*, 82 Ariz. at 159, but instead should simply undertake the narrow task of determining whether the legislature acted within its constitutional authority. We should never rewrite laws or exercise legislative functions. *See The Federalist* No. 78, at 140 (Alexander Hamilton) (Richard Beeman ed., 2012) ("[L]iberty can have nothing to fear from the judiciary alone but would have every thing to fear from its union with either of the other departments[.]"). And if a matter is constitutionally entrusted to another branch of government, we should refrain from intervening in its resolution. *See, e.g.*, *Nixon v. United States*, 506 U.S. 224, 228 (1993) (describing the "political question" doctrine). All of these are proper rules of judicial deference.

¶41        Similarly, as a matter of statutory *interpretation*, we should whenever possible avoid constructions that would render the legislature's handiwork unconstitutional. Whenever a court interprets any document, whether a contract or statute, we should disfavor "interpretations that would nullify the provision or the entire instrument." Scalia & Garner, *supra* at 66–68 (explaining the "presumption of validity"). More specifically, we should avoid interpreting a statute in a way that places its constitutionality in doubt. That interpretative canon traces to the notion

that "a legislature should not be presumed to be sailing close to the wind, so to speak—entering an area of questionable constitutionality without making that entrance utterly clear." *Id.* at 248 (explaining the "constitutional-doubt canon"). Although "that is today a dubious rationale," it is still the case that "courts should minimize the occasions on which they confront and perhaps contradict the legislative branch." *Id.* at 248–49; *see, e.g.*, *Gomez v. United States*, 490 U.S. 858, 864 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question."). By happy happenstance, interpreting a statute to avoid an unconstitutional effect is ordinarily an outcome that both parties should favor, as the challenger's constitutional rights are preserved while so too is the legislation.

¶42 But interpreting statutes to avoid constitutional problems when an equally plausible interpretation presents itself is different, by order of magnitude, from a presumption that a statute is constitutional. When a court defers to legislative judgments about the constitutionality of statutes, it abdicates its most essential constitutional duty. *See, e.g.*, *Sch. Dists' All. for Adequate Funding of Special Educ. v. State*, 244 P.3d 1, 12 (Wash. 2010) (Sanders, J., dissenting). Indeed, the presumption of constitutionality is at war with de novo review, which we announce every time we decide a statute's constitutionality. *See, e.g.*, *Gallardo*, 236 Ariz. at 87 ¶ 8. De novo means "anew." *De novo*, Black's Law Dictionary (11th ed. 2019). Anew means "as if a new start were being made and without reference to or observance of past acts or actions." *Anew*, Webster's Third New International Dictionary (3d ed. 2002). What we mean by de novo review, when coupled with a presumption of constitutionality, is that we disregard the reasoned legal judgment of the courts below, but we credit the legislature's self-interested determination of its own constitutional authority. That is not true de novo review, yet true de novo review is exactly what our constitutional duty requires.

¶43 The presumption of constitutionality is increasingly subject to critical judicial and scholarly reexamination. *See, e.g.*, Randy E. Barnett, *Restoring the Lost Constitution: The Presumption of Liberty* (2004); F. Andrew Hessick, *Rethinking the Presumption of Constitutionality*, 85 Notre Dame L. Rev. 1447 (2010); Robert F. Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7

U. Puget Sound L. Rev. 491, 507 (1984) (presumption of constitutionality "seriously hampers the courts' accomplishment of what . . . the Washington Declaration [of Rights] defines as the fundamental purpose of our state's constitution and government: to protect and maintain individual rights").

¶44　　　Three members of the Texas Supreme Court recently questioned excessive judicial deference to legislative enactments in *Patel v. Texas Department of Licensing and Regulation*. The justices noted that "[a] pro-liberty presumption is . . . hardwired into the Texas Constitution," meaning that "Texans are thus presumptively free, and government must justify its deprivations." 469 S.W.3d 69, 93 (Tex. 2015) (Willett, J., concurring). The same is true under the Arizona Constitution. The Texas justices aptly observed that "[l]awmakers' policy-setting power is unrivaled—but it is not unlimited. Preeminence does not equal omnipotence. Politicians decide if laws pass, but courts decide if those laws pass muster." *Id.* at 95. Citing *The Federalist* No. 10, these concurring justices observed that "when people, or branches of government, are free to judge their own actions, nothing is prohibited." *Patel*, 469 S.W.3d at 110. Although "[t]he question for judges is not whether a law is sensible but whether it is constitutional," *id.* at 102, "we should be neutral arbiters, not bend-over-backwards advocates for the government." *Id.* at 116.

¶45　　　What does the presumption of constitutionality mean in real life and real cases? It is hard to say. Is it mere verbiage that we recite to show we are appropriately constrained before we strike down a law? *See, e.g.*, John D. Leshy, *The Arizona State Constitution* 119 (2d ed. 2013) (asserting that the Court has "overstate[d] the degree to which the judiciary defers to legislative judgments"). Or is it a significant weight on the scales of justice, which presents a real risk of sustaining unconstitutional laws because they do not meet the more exacting requirement of being "clearly" unconstitutional? Either way, the result is unsatisfying, yet sends an unmistakable message to Arizonans that they face a judicially manufactured uphill battle any time they challenge an infringement of their rights.

¶46　　　We should dispense with the presumption. Although deeply embedded in our jurisprudence, it should not continue to subordinate the essential role of the independent judiciary in protecting individual rights that was so central to our constitutional design. On this point our

constitution furnishes the necessary counsel: "A frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government."  Ariz. Const. art. 2, § 1.