IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

In re the Matter of:

ANNETTE WOOD, *An Adult*.

No. 1 CA-CV 22-0710
FILED 05-30-2024

---

Appeal from the Superior Court in Coconino County
No. S0300GC202200040
The Honorable Stacy Lynn Krueger, Judge

### VACATED AND REMANDED

---

COUNSEL

Coconino County Legal Defender's Office, Flagstaff
By Joseph Adam Carver
*Counsel for Appellant*

Coconino County Attorney's Office, Flagstaff
By William P. Ring, Heather Mosher
*Counsel for Appellee*

Arizona Attorney General's Office, Phoenix
By Joshua D. Bendor, Clinten N. Garrett
*Counsel for Amicus Curiae*

Arizona Center for Law in the Public Interest, Phoenix
By Daniel J. Adelman, Anne C. Ronan, Nicholas Ansel
*Counsel for Amicus Curiae*

Disability Rights Arizona, Tucson
By Maya S. Abela, Tamaraingsey In
*Counsel for Amicus Curiae*

---

**OPINION**

Vice Chief Judge Randall M. Howe delivered the opinion of the court, in which Judge Jennifer M. Perkins and Judge Daniel J. Kiley joined.

---

**H O W E**, Judge:

¶1        Annette Wood appeals the trial court's order finding her incapacitated and placing her under a general guardianship, making her ineligible to vote under Arizona Constitution Article 7, Section 2(C). Wood argues that taking away her right to vote violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. She contends that A.R.S. §§ 14-5101(3), -5304, and -5304.02 (collectively, the "guardianship statutes") violate due process because they (1) terminate a person's right to vote upon establishment of a general guardianship without a determination of the person's voting capacity and (2) place the burden on the ward to justify retaining the right to vote. She also argues that § 14-5304.02 violates the Equal Protection Clause because it denies a subset of incapacitated persons the opportunity to retain the right to vote while granting another subset of incapacitated persons the opportunity to do so.

¶2        We agree that the guardianship statutes on their face violate due process in two ways. First, they terminate a person's right to vote upon establishment of a general guardianship without a determination of the person's voting capacity. Second, they impose the burden of showing voting capacity on the ward. Because the statutes violate due process, we need not consider Wood's equal protection argument. *See State ex rel. Brnovich v. City of Phoenix*, 249 Ariz. 239, 247 ¶ 31 (2020) (resolving a constitutional challenge on one ground obviates the need to consider other grounds). We therefore vacate the trial court's order and remand for further proceedings in accordance with our decision.

**FACTS AND PROCEDURAL HISTORY**

¶3        Sixty-three-year-old Wood lives in an assisted living facility in Flagstaff. She uses a wheelchair and needs assistance with most of her daily activities. In May 2022, the Coconino County Public Fiduciary ("CCPF") petitioned to appoint a guardian for Wood because of a report

that Wood had cognitive limitations and that a member of the assisted living facility's staff had improperly asked her to sign checks for her care.

¶4        The CCPF alleged that Wood needed a guardian to make financial and medical decisions for her based on a health professional's report and its case administrator's interviews with Wood and the assisted living facility's staff. The health professional diagnosed Wood with unspecified dementia without behavioral disturbance, severe intellectual disabilities, and a cognitive communication deficit. The health professional noted that Wood's impairments nevertheless do not "affect [her] ability to receive or evaluate information needed in making or communicating personal and financial decision[s]." The report also listed Wood's many medications.

¶5        During the interviews with the CCPF's case administrator, Wood said that she was not currently taking any medication, even though she was. After the interviews, the case administrator concluded that Wood suffers from memory loss, impaired judgment, severe symptoms of anxiety and depression, and lacks insight into her medical condition and treatment. The CCPF requested that the court place Wood under a general guardianship because other alternatives, such as a limited guardianship or obtaining a power of attorney, were inappropriate. It did not, however, explain why a limited guardianship would be inappropriate.

¶6        The court appointed an investigator who interviewed Wood, the manager of the assisted living facility, and Wood's case manager. Wood was unable to remember her address or whether she had lunch that day. The investigator also reviewed the health professional's report and accompanying documents. The investigator then reported that "Wood is incapacitated by reason of unspecified dementia without behavioral disturbance." The investigator also reported that she suffers "severe intellectual disabilities" and a "communication deficit to the extent that she lacks sufficient understanding or capacity to make or communicate responsible decisions concerning her person." She concluded that Wood would benefit from having a guardian.

¶7        Wood agreed that she needed a guardian but requested a limited guardianship, instead of a general guardianship, so that she could retain her right to vote. The trial court set a hearing under § 14-5304.02 to determine whether (1) a less restrictive means than a general guardianship could meet her needs and (2) she was capable of voting.

¶8 At the hearing, the court followed § 14-5304.02's requirement that, when a limited guardian is appointed, Wood had the burden to prove that she "retain[ed] sufficient understanding to exercise the right to vote." Wood testified that she needed a guardian to make her medical decisions. Asked whether she needed a guardian for any other reason, she responded, "No." She also testified she did not need help with her finances. When asked whether she had trouble with her memory, she answered, "No. [] I'm fine." She accurately identified the city she was living in but could not remember her physical address.

¶9 Wood then testified that she wanted to vote. When asked about how she decided whom to vote for, she responded "I pay attention . . . as to how they are on TV and everything and I decide." She added that although she talks to other people when deciding whom to vote for, she makes her decision independently. The court asked whether she could identify the current president and vice president. She was initially unable to recall the president's name but remembered his name later during the hearing. When asked when she intended to vote next, she stated, "Probably around the 6th, I think. I'm not actually sure." Finally, the court asked her to describe the process that she went through to vote by mail. She said, "Oh, they just send it to me and I fill it out and put it in the mailbox." Wood presented no other evidence. The CCPF presented no new evidence and relied on the evidence submitted with its petition.

¶10 The trial court found that Wood's needs made a limited guardianship inappropriate and placed her under a general guardianship. The court alternatively ruled that "even if the [c]ourt had considered a limited [g]uardianship based on her need level, the [c]ourt does not find by clear and convincing evidence that she has—that she retains sufficient understanding to be able to vote." The court applied its own understanding of the phrase "sufficient understanding to exercise the right to vote," acknowledging that it lacked appellate court guidance on the phrase's meaning. Wood timely appealed. This court has jurisdiction under A.R.S. § 12-2101(A)(9).

**DISCUSSION**

¶11 Wood challenges the general guardianship order only to the extent that it terminated her right to vote. She argues that Arizona's disenfranchisement of those under a general guardianship violates the Due

4

Process Clause.[1] This court reviews the constitutionality of a statute de novo. *State v. Arevalo*, 249 Ariz. 370, 373 ¶ 9 (2020). Whenever possible, this court will construe statutes to avoid rendering them unconstitutional. *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 230 ¶ 25 (2020). But in reviewing statutes "deny[ing] some residents the right to vote, the general presumption of constitutionality afforded state statutes . . . [is] not applicable." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627–28 (1969); *see also Gallardo v. State*, 236 Ariz. 84, 87 ¶ 9 (2014) (noting that "if a law burdens fundamental rights . . . any presumption in its favor falls away").

## I.     General Principles

**¶12**          Arizona's Probate Code establishes the procedures to determine whether an individual is incapacitated and needs a guardian. A court may appoint a general or limited guardian if the court finds by clear and convincing evidence that (1) "[t]he person for whom a guardian is sought is incapacitated"; (2) "[t]he appointment is necessary to provide for the demonstrated needs of the incapacitated person"; and (3) "[t]he person's needs cannot be met by less restrictive means, including the use of appropriate technological assistance." A.R.S. § 14-5304(B). In placing persons under a guardianship, the trial court "shall encourage the development of maximum self-reliance and independence of the incapacitated person." A.R.S. § 14-5304(A).

**¶13**          Arizona law does not define "general guardianship" or "limited guardianship." But it defines "[i]ncapacitated person" as

> any person who is impaired by reason of mental illness, mental deficiency, mental disorder, physical illness or disability, chronic use of drugs, chronic intoxication or other cause, except minority, to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person. In cases of limited guardianship only, a person is not deemed an incapacitated person for purposes of voting if the person files

---

[1]          Amicus Curiae Disability Rights Arizona asserts that the guardianship statutes violate the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973. These arguments, however, would expand the issues on appeal to ones not made by either party and we decline to address them. *See Vangilder v. Ariz. Dep't of Revenue*, 252 Ariz. 481, 493 ¶ 46 (2022).

a petition and has a hearing and the judge determines by clear and convincing evidence that the person retains sufficient understanding to exercise the right to vote pursuant to § 14-5304.02.

A.R.S. § 14-5101(3). A person is unable to make "responsible decisions concerning his person" if "the putative ward's decisionmaking process is so impaired that he is unable to care for his personal safety or unable to attend to and provide for such necessities as food, shelter, clothing, and medical care, without which physical injury or illness may occur." *In re Guardianship of Reyes*, 152 Ariz. 235, 236 (App. 1986) (quoting *In re Boyer*, 636 P.2d 1085, 1089 (Utah 1981) (internal quotation marks omitted)). The definition of incapacitated person does not consider a person's capacity to vote. *See* A.R.S. § 14-5101(3); *see also In re Guardianship of Reyes*, 152 Ariz. at 236 (not listing voting capacity as a consideration in determining whether a person is incapacitated).

**¶14**        The court's finding that a person is incapacitated terminates that person's right to vote. The Arizona Constitution provides that "[n]o person who is *adjudicated an incapacitated person* shall be qualified to vote at any election . . . ." Ariz. Const. art. 7, § 2(C) (emphasis added). This is so regardless whether the person is placed under a general or limited guardianship. *See* A.R.S. §§ 16-101(A)(6) (making incapacitated persons unqualified to register to vote), -165(A)(3) (directing the county recorder to cancel a person's voter registration if the person is adjudicated incapacitated). Under the guardianship statutes, however, a person placed under a limited guardianship can retain the right to vote "if the person files a petition, has a hearing and the judge determines by clear and convincing evidence that the person retains sufficient understanding to exercise the right to vote." A.R.S. § 14-5304.02; *accord* A.R.S. § 14-5101(3). A person placed under a general guardianship, in contrast, has no such recourse.

## II.        The Right to Vote

**¶15**        Wood argues that her procedural due process rights were violated because the guardianship statutes terminate the right to vote of a person under a general guardianship without first determining the person's voting capacity. This court evaluates procedural due process challenges to a voting restriction under the framework articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), known as the "*Anderson/Burdick* framework." *See Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019) (concluding that the *Anderson/Burdick* framework "applies to *all* First and Fourteenth

Amendment challenges to state election laws"); *see also Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir. 2021) (similar).

¶16    Under the *Anderson/Burdick* framework, this court determines whether a person's due process rights have been violated by "weigh[ing] 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Laws that impose a "severe" burden on voting rights must meet strict scrutiny. *Id.* "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).

¶17    Terminating the right to vote is the most severe burden on that right. The process required to place a person under a guardianship does not involve an individualized inquiry into the person's voting capacity. By denying the right to vote to persons under a general guardianship, the statutes impose a severe burden on their right to vote. The guardianship statutes are therefore subject to strict scrutiny under the *Anderson/Burdick* framework.

¶18    To satisfy strict scrutiny, the State must establish both that the law is narrowly tailored to serve a compelling state interest and that it employs the "least restrictive means practically available." *Arizonans for Second Chances, Rehab. & Pub. Safety v. Hobbs*, 249 Ariz. 396, 409 ¶ 42, 417 ¶ 82 (2020) (quoting *Bernal v. Fainter*, 467 U.S. 216, 227 (1984)). A statute is not "narrowly tailored" unless it "targets" the "exact source of the evil it seeks to remedy" without "eliminat[ing] . . . more than" necessary to achieve that goal. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808–10 (1984)). If, in other words, "there are other, reasonable ways to achieve" the State's legitimate goals "with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference." *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972); *see also Second Chances*, 249 Ariz. at 417 ¶ 82 ("[S]trict scrutiny requires the least restrictive means among available, effective alternatives." (citation omitted)).

¶19    Neither the CCPF nor Amicus Curiae the Arizona Attorney General identify any interest, compelling or otherwise, served by

terminating the right to vote of persons subject to a general guardianship without first determining the person's voting capacity. Arizona Constitution Article 7, Section 2(C) does disqualify "an incapacitated person" from voting, which can be read as a measure to prevent from voting those who have no capacity to vote. Assuming this is the State's interest, terminating the right to vote of persons under a general guardianship without providing a process to determine their capacity to vote is not narrowly tailored to serve that interest, nor the least restrictive means of achieving that interest. That is because a person may be placed under a general guardianship for a mental illness or other reason that has nothing to do with the person's capacity to vote. *See In re Sherrill's Estate*, 92 Ariz. 39, 43 (1962) ("That one is under guardianship does not prevent him from performing the acts of which he is in fact capable."); *see also Doe v. Rowe*, 156 F. Supp. 2d 35, 55–56 (D. Me. 2001) ("[U]nder any reasonable definition, 'mental illness' cannot serve as a proxy for mental incapacity with regards to voting."). The guardianship statutes are thus not narrowly tailored, nor the least restrictive means of achieving the State's interest: they target all wards, not just those who may lack voting capacity.

**¶20**  The Legislature has recognized that placing a person in a guardianship does not necessarily deprive the person of all capacities. Under § 14-5304.01, a guardianship does not suspend a ward's privilege to drive unless a court finds that the incapacity warranting the guardianship affects a ward's capacity to drive safely. This same procedure could easily be applied to determining whether the incapacity warranting the guardianship affects the ward's capacity to vote. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000) ("[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it."). Therefore, terminating the right to vote without a hearing to determine the person's voting capacity is not the least restrictive means of achieving the State's goal. Thus, to the extent that the guardianship statutes terminate a person's right to vote without first providing a hearing to determine that person's capacity to vote, they violate due process.

## III. Placement of the Burden of Proof

**¶21**  Although the court held a hearing before terminating Wood's right to vote, her due process rights were still violated because the statutes placed the burden on her to show voting capacity. Under § 14-5304.02, "[a] person for whom a limited guardian is appointed shall retain the right to vote if the person files a petition, has a hearing and the judge determines by clear and convincing evidence that the person retains sufficient understanding to exercise the right to vote." *Accord* A.R.S. § 14-5101(3).

8

¶22         Section 14-5304.02 does not comport with due process to the extent that it places the burden on the ward to show by clear and convincing evidence that he or she retains sufficient understanding to exercise the right to vote. Placing such burden on the ward severely burdens the ward's right to vote. *See Burdick*, 504 U.S. at 434. As a result, § 14-5304.02 is subject to strict scrutiny under the *Anderson/Burdick* framework. Again, neither the CCPF nor the Attorney General identify any interest served by placing the burden on the ward to show voting capacity. Assuming the State's interest is to prevent those not capable of voting from voting, *see supra* ¶ 19, placing the burden of proof on the ward is not the least restrictive means of achieving that goal, *see Second Chances*, 249 Ariz. at 417 ¶ 82. This is so because a less restrictive means exists: requiring the petitioner seeking the guardianship to prove that the alleged incapacitated person lacks the capacity to vote.

¶23         Generally, the party seeking to interfere with a fundamental right carries the burden of showing that the interference is warranted. *Troxel v. Granville*, 530 U.S. 57, 69–70 (2000) (ruling that placing on parents the burden "of disproving" that grandparent visitation would be in the children's best interests violated due process). Here, placing the burden on the petitioner seeking the guardianship to show that a person subject to guardianship proceedings lacks the capacity to vote comports with due process and serves the State's interest by ensuring that the State is preventing from voting only those who lack the capacity to vote. Thus, the petitioner must show that the alleged incapacitated person lacks the capacity to vote. *See id.* And because the right to vote is a fundamental right, *Wesberry v. Sanders*, 376 U.S. 1, 16 (1964), the petitioner must show that the alleged incapacitated person lacks the capacity to vote by clear and convincing evidence, *Santosky v. Kramer*, 455 U.S. 745, 769 (1982) (holding that a clear and convincing standard of proof satisfied due process in terminating parental rights). *See also Addington v. Texas*, 441 U.S. 418, 433 (1979) (holding that a clear and convincing standard of proof satisfied due process in civil commitments to mental hospital for an indefinite period).

¶24         The Attorney General argues that placing the burden on the ward is nonetheless constitutional because only a "modest quantum of evidence" is necessary to show a sufficient understanding to exercise the right to vote. This argument misses the point. The degree of proof is irrelevant because the issue here is whether the ward should bear *any* evidentiary burden. As explained *supra* ¶ 23, due process requires that, before terminating a person's fundamental right to vote, the petitioner must show by clear and convincing evidence that the person lacks the capacity to vote. Wood was denied due process because § 14-5304.02 places the burden

of proof on her and not the petitioner. To comply with due process, the petitioner was required to prove by clear and convincing evidence that Wood lacked the capacity to vote.

## IV.    Sufficient Understanding to Exercise the Right to Vote

**¶25**        Wood argues finally that she was denied due process because, regardless who bears the burden of proof, the standard she had to meet to regain her right to vote is vague. A person under a limited guardianship "shall retain the right to vote" if that person "retains sufficient understanding to exercise the right to vote." A.R.S. § 14-5304.02; *accord* A.R.S. § 14-5101(3). Wood argues this phrase could be interpreted to mean that the ward must (1) "show an understanding of the mechanics of voting, like how to fill out a ballot," (2) "articulate a rationale for [his or her] voting choices," or (3) satisfy both alternatives. The Attorney General argues that the phrase should be interpreted to require proof that the ward has the mental capacity to understand the nature and effect of voting.

**¶26**        This court reviews the interpretation of statutes de novo. *City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 210 ¶ 10 (2019). "[T]he best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction." *State v. Hansen*, 215 Ariz. 287, 289 ¶ 7 (2007) (quoting *Deer Valley Unified Sch. Dist. No. 97 v. Houser*, 214 Ariz. 293, 296 ¶ 8 (2007)). Statutory phrases must be interpreted "in accordance with their commonly accepted meanings, 'unless the legislature has offered its own definition of the words or it appears from the context that a special meaning was intended.'" *State v. Reynolds*, 170 Ariz. 233, 234 (1992) (internal citation omitted) (quoting *Mid Kan. Fed. Sav. & Loan Ass'n of Wichita v. Dynamic Dev. Corp.*, 167 Ariz. 122, 128 (1991)). In determining "commonly accepted meanings," *id.*, "we may refer to established and widely used dictionaries," *Special Fund Div. v. Indus. Comm'n*, 232 Ariz. 110, 113 ¶ 12 (App. 2013).

**¶27**        Although the parties and amici curiae believe the phrase "sufficient understanding to exercise the right to vote" may have multiple meanings, the critical words are ordinary and have commonly understood meanings that lead to a single meaning of the phrase. "Voting" means "[t]he expression of one's preference or opinion in . . . [an] election by ballot." *Vote*, Black's Law Dictionary (11th ed. 2019). "Sufficient" means "enough to meet the needs of a situation or a proposed end." *Sufficient*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/sufficient (last visited May 16, 2024). And finally, "understanding" means "a mental grasp," or "the power of comprehending." *Understanding*, Merriam

-Webster's Dictionary, https://www.merriam-webster.com/dictionary/understanding (last visited May 16, 2024). Thus, under the ordinary and commonly understood meaning of these words, a person retains sufficient understanding to exercise the right to vote under § 14-5304.02 if that person has enough comprehension to know that he or she is expressing a preference on a ballot for a particular candidate for a political office or for or against a policy measure.

¶28 Admittedly, wisely exercising that right is often difficult and complex. But the wisdom of a particular vote (or a particular voter) is subjective and not a condition of the right to vote. If a citizen understands that by voting he or she is choosing a particular candidate for a particular office or making a choice on a particular ballot measure, the citizen has the capacity to vote. This is true even when the citizen is under a guardianship. Thus, before terminating the right to vote, the petitioner must show and the court must find by clear and convincing evidence that the alleged incapacitated person cannot express his or her preference on a ballot.

## CONCLUSION

¶29 We vacate and remand for further proceedings consistent with this opinion. The trial court must reconsider whether Wood can express her preference on a ballot. The burden of proof lies with the CCPF, not Wood. The court may hold an additional evidentiary hearing if it finds it necessary in resolving this question.



AMY M. WOOD • Clerk of the Court
FILED:    TM