**ON OUR TERMS '97 PAC,
et al., Plaintiffs**

v.

**SECRETARY OF STATE OF STATE
OF MAINE, Defendant.**

**No. 98–104–B–DMC.**

United States District Court,
D. Maine.

Dec. 9, 1999.

William Maselli, Stephen M. Brochu, Law Office of William Maselli, Auburn, ME, for plaintiffs.

Phyllis Gardiner, Andrew S. Hagler, Assistant Attorney General, Augusta, ME, for defendant.

***FINDINGS OF FACT AND
CONCLUSIONS OF
LAW*** [1]

DAVID M. COHEN, United States Magistrate Judge.

Before the court is the First Amendment challenge of plaintiffs On Our Terms '97 PAC ("OOT") and U.S. Term Limits ("USTL") to 21–A M.R.S.A. § 904–

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge David M. Cohen conduct all proceedings in this case, including trial, and to order the entry of judgment.

A ("Statute"), which prohibits payment to circulators of initiative and referendum petitions for the collection of signatures if that payment is based on the number of signatures collected.[2] The plaintiffs seek declaratory judgment and injunctive relief as well as attorney fees pursuant to 42 U.S.C. § 1988.[3] Complaint (Docket No. 1) ¶ 17. Following a bench trial before me on December 1–2, 1999 I now find for the plaintiffs on the basis of the following findings of fact and conclusions of law.

## I. Findings of Fact

1. Maine is among twenty-four states that permit citizens to initiate legislation by means of an initiative and referendum process, having conferred that right in 1910.

2. Proponents of initiative or referendum measures must first submit an application, including draft language, for approval to the State of Maine Office of the Secretary of State ("Secretary"). Once a measure is approved for circulation, proponents are afforded one year within which to collect sufficient signatures to qualify it for the ballot. Signatures are good for one year; if stale they are invalidated.[4]

3. Proponents must collect enough validated signatures of registered voters to equal at least ten percent of the total number of votes cast in the most recent gubernatorial election. In 1997 this number totalled 51,131; it is now 42,101. Sheets containing signatures, referred to as "petitions," must be submitted to municipal registrars for verification that signatories purporting to reside in a particular municipality are indeed registered to vote there. Petitions then must be submitted to the Secretary for validation. The deadline for submitting petitions to the Secretary in time to qualify for the November ballot is keyed to the close of the legislative term, typically falling in late January or early February. Petitions must be submitted to municipal registrars for verification at least ten days prior to that deadline.

4. Circulators of petitions must both be residents of, and registered voters in, Maine. Prior to 1994 the payment of circulators was unregulated; they could be volunteer or paid and, if paid, could be paid by any methodology, including per signature.

5. In 1994 the Maine legislature enacted the Statute as part of "An Act to Promote Integrity in the Citizens Petition Process." The Act, which became effective July 14, 1994, provided in relevant part:

### § 904–A. Payment per signature; prohibition

A circulator of an initiative or a referendum petition or a person who causes the circulation of an initiative or referendum petition may not receive payment for the collection of signatures if that payment is based on the number of signatures collected. Nothing in this section prohibits a circulator of an initiative or a referendum petition or a person who causes the circulation of an initiative or referendum petition from being

---

**2.** Plaintiffs Initiative & Referendum Institute, Americans for Sound Public Policy, Progressive Campaigns, Inc. and Shannon L. Brady were dismissed for lack of standing. *See* Report of Final Pretrial Conference and Order (Docket No. 46) at 2. Two other plaintiffs, Jason Smith and Nancy Falster, had no surviving claims to press to trial following the entry of summary judgment. *Id.* Summary judgment was granted in favor of the defendant on all claims, apart from that at issue here, that were presented in the complaint. Memorandum Decision on Motion To Strike Affidavit and Recommended Decision on Cross–Motions for Summary Judgment (Docket No. 36); Order Affirming the Recommended Decision of the Magistrate Judge (Docket No. 45).

**3.** The plaintiffs' request for preliminary injunctive relief was denied. Order Denying Plaintiffs' Request for Preliminary Injunction (Docket No. 14).

**4.** Prior to April 1998 proponents were allowed three years within which to qualify a measure for the ballot. At all relevant times, signatures have been valid only for one year.

paid a salary that is not based on the number of signatures collected.

Ch. 599, 1993 Me. Laws 1505.

6. In floor debate in the Maine House prior to passage of the Act its chief sponsor, Representative Kilkelly, explained, "I chose to present this particular piece of legislation because I read in the newspaper about a recent citizen petition process in which people were paid up to $1.40 for each signature that they gathered. I felt that was wrong.... Our job today is to say is it okay to allow people to bounty-hunt for signatures on a per-signature basis or is it not okay." Me. Legis. Rec. 285 (1994).

7. In 1997 the Maine legislature amended the Statute to shift the focus of its prohibition to payment per signature rather than receipt of such payment. "An Act to Require Responsibility of the Employers of Persons who Collect Signatures" reworded the Statute effective June 26, 1997 as follows:

§ 904–A. Payment per signature; prohibition

A person may not pay a circulator of an initiative or a referendum petition or another person who causes the circulation of an initiative or referendum petition for the collection of signatures if that payment is based on the number of signatures collected. Nothing in this section prohibits a circulator of an initiative or a referendum petition or a person who causes the circulation of an initiative or referendum petition from being paid a salary that is not based on the number of signatures collected.

Ch. 61, 1997 Me. Laws 325.

8. During the summer of 1997 John M. Michael of Auburn, Maine approached USTL, a national organization based in Washington, D.C., to inquire whether it would be willing to help fund a term-limits petition measure in Maine. The goal of the so-called Voluntary Term Limits Pledge drive ("Pledge Drive") was passage of legislation that would invite the Maine congressional delegation to pledge to limit its terms of office. The fact that a legislator had agreed to take the pledge would be noted on the election ballot, as would any subsequent failure of the signatory to fulfill his or her pledge. USTL, through its national field director Michael Dane Waters and its national director Paul Jacob, expressed interest in helping fund the campaign.

9. This was not the first occasion on which Michael, a former member of the Maine legislature, or USTL had pressed for term-limit reforms in Maine. During 1992–93 Michael volunteered to assist in an initiative drive designed to limit terms of state legislators. During 1993–94 Michael was among several organizers, and USTL a backer, of an initiative drive designed to limit the terms of Maine's U.S. congressional delegation. Again in 1995–96 Michael served as organizer and USTL key backer of a so-called Informed Voter Law petition drive.

10. In both the 1993–94 and 1995–96 campaigns petition circulators were paid per signature. Both initiatives qualified for the ballot and ultimately were enacted into law. Both Michael and Jacob were aware that the Statute, as originally enacted, prohibited receipt of payment per signature. However, because they considered it unconstitutional and because it did not prohibit payment per signature (as opposed to receipt of such payment), they felt comfortable continuing to pay circulators per signature during the 1995–96 campaign.

11. During the summer of 1997 Michael, on behalf of OOT, began working with USTL to draft language for the Pledge Drive, which was submitted to the Secretary for approval on July 3, 1997. During these preliminary stages Jacob became aware that the Statute had been amended to proscribe payment per signature to petition circulators. This development undermined USTL's and Michael's comfort in continuing to pay circulators per signature inasmuch as neither was

willing to risk the possibility of a lawsuit or criminal prosecution of Michael. USTL and Michael identified three options: to abort the campaign, to attempt to conduct the campaign without paying circulators per signature, or to file a lawsuit challenging the Statute. The latter option was not attractive inasmuch as such a lawsuit would divert resources from the Pledge Drive and would not likely be decided in time to qualify the measure for the November 1998 ballot. USTL and Michael elected to attempt to qualify the measure using a different payment methodology.

12. USTL sought bids from several national petition-drive firms to conduct the Pledge Drive. It received one bid that it considered too high. This bid was high, in USTL's view, because of the uncertainties inherent in paying circulators by any method other than per signature.

13. Michael also bid to manage the petition-circulation phase of the Pledge Drive. By letter dated July 28, 1997 he presented a written proposal to USTL to collect 73,500 signatures, of which at least 55,125 were to be validated, at a total cost of $55,125. Inasmuch as Michael estimated his expenses at $43,646 (including $36,750 for signature collection, which Michael translated to a rate of fifty cents per signature), his expected consulting fee was $11,479.[5] USTL accepted the proposal, and OOT received a down-payment check in the amount of $7,500 the following day.

14. On August 12, 1997 the Secretary approved the Pledge Drive measure for circulation. Petition circulation commenced three days later. Michael, who had projected that the circulation phase would last from mid-August through December, encountered several immediate problems. He had never paid circulators per hour and was unsure how much to pay, although he settled on a flat rate of either $6.00 or $6.50 per hour. Some potential circulators were not interested; others disappeared. He had not encountered these

problems in past initiative and referenda campaigns. Michael was concerned that certain payment strategies could be construed as running afoul of the Statute, including setting a minimum number of signatures to be collected per hour or raising the rate of hourly pay to reward good performance or to incentivize circulators to collect signatures as the weather worsened. Further, Michael expected that setting a minimum number of signatures would result in a "don't ask, don't tell" mentality, in which circulators would claim to have worked the number of hours necessary to achieve the minimum regardless of how many hours they actually worked. To the extent circulators quit or were fired, Michael would have to expend additional time and money hiring and training replacements.

15. Michael communicated these problems to Waters and/or Jacob at USTL, stating that as a result he could no longer guarantee that he could hold costs to those set forth in his bid. Neither Waters nor Jacob travelled to Maine to verify Michael's account or received documentation evidencing it. However, both judged the account accurate based not only on what Jacob considered Michael's credibility but also on both Waters' and Jacob's personal experience in other situations in which they had been unable to pay circulators on a per-signature basis.

16. Prior to becoming involved in the Pledge Drive campaign Waters had travelled to North Dakota on behalf of USTL to assist in a term-limits initiative campaign that had been floundering. Upon his arrival, Waters determined that the problems were caused by a North Dakota ban on payment per signature to initiative and petition circulators. Seventy to eighty percent of circulators hired on an hourly basis were returning with few or no signatures. Thus, organizers considered it necessary to hire additional staff to monitor

---

5. Michael testified that his consulting fee would have been eroded by the need to hire extra office staff and possible courier fees that were not factored into his budget estimates.

the circulators and to fire those who were not collecting sufficient signatures. In Waters' experience, which included involvement in forty to fifty initiative or referendum campaigns, paying by signature was a clean, simple process. In contrast, paying hourly was a "management nightmare," affording no incentive to circulators to obtain greater numbers of signatures. The North Dakota campaign cost four to five times more than typical of such a campaign.

17. Jacob had assisted in a 1992 Missouri initiative campaign in which organizers judged it necessary, as time grew short, to hire circulators from temporary employment agencies, which did not permit payment per signature. Staff were brought in to monitor the temporary-agency circulators, who were discovered to be failing to ask for signatures about fifty percent of the time. In Jacob's view, petition circulation is a stressful job fraught with a high degree of rejection and entailing the need to overcome a natural social block to soliciting strangers. People sign petitions primarily because they are asked to do so. Hence, it is critical to stay motivated to ask every person you encounter to sign. In Jacob's view money, in the form of payment per signature or at least a bonus for extra signatures, provides that motivation.

18. As a result of Michael's reports Jacob, in conjunction with USTL founder Howard Rich, decided to withdraw backing from the Pledge Drive. By September 10, 1997 the Pledge Drive petition-circulation effort ended, with the bulk of petitions having been circulated in the two-week period from August 15 through August 29. Expenditures for the aborted campaign totalled $7,512.25, of which Michael received $5,335 in consulting fees and thirteen petition circulators received a total of $807.14 for signature collection. In spring 1998 Michael discarded the Pledge Drive peti-

tions as "clutter"; these provided the only evidence of how many signatures were collected during the short-lived campaign.

19. There are many uncertainties in initiative and referenda campaigns, some of which drive up costs and cause organizers such as Michael to renegotiate their contracts with backers such as USTL. These uncertainties can result, among other things, from unrealistic bids, poor organization, a late start in signature collection, failure to take advantage of the opportunity to collect signatures at polling places on Election Day and bad weather. During the 1993–94 Maine term-limits petition drive costs doubled because of a combination of a late start, organizational problems and bad winter weather. Circulators initially were paid sixty or seventy cents per signature; as the deadline to submit petitions loomed and the weather worsened, proponents paid more than $1.00 per signature. USTL's fixed-price contracts with organizers were altered weekly if not daily toward the end of the campaign.

20. A ban on payment per signature to circulators also fuels uncertainty inasmuch as it renders prediction of costs and time frames for collection efforts more difficult. This in turn decreases confidence that a signature-collection effort will succeed. For these reasons USTL, a nonprofit organization with limited resources and a fiduciary obligation to its board of directors and donors, does not intend to become involved in another term-limits petition drive in Maine while the Statute remains in effect. In the absence of the Statute, USTL would be interested in funding at least two term-limits initiative drives in Maine: a revival of the Pledge Drive and a new state term-limits campaign.

21. From 1910 through 1992 forty-nine initiative and referendum petitions qualified for the ballot in Maine. Since 1993 fourteen have qualified.[6] Since the effec-

---

6. During this period the Secretary rejected one initiative/referendum measure submitted for approval for placement on the ballot, a so-

called one percent tax-cap measure. The Secretary detected blatant forgeries in dates on which signatories purportedly had signed

tive date of the Statute on July 14, 1994 eleven petitions have been approved for circulation that have qualified for placement on the ballot. Since June 26, 1997— the effective date of the amendment to the Statute—four petitions have been approved for circulation that have qualified for placement on the ballot.[7]

22. By taking advantage of the opportunity to collect signatures at the polls on Election Day, it is possible to conduct a successful initiative or referendum campaign in Maine relying entirely on volunteer circulators. Election Day poses an excellent opportunity to collect signatures, particularly in a so-called "on" year such as one in which presidential or gubernatorial candidates are elected, because of access to signatories known to be registered voters of a particular municipality, whose signatures are as a result highly likely to be validated.[8]

23. George Christie, director of the Maine Citizens Leadership Fund, oversaw a successful 1995 drive to qualify a clean-election-act initiative measure for the ballot. Using a paid staff of six and relying on coalition partners including the AFL–CIO and the American Association of Retired Persons to solicit their own membership, Christie's group was able commencing after Labor Day 1995 to recruit 1,100 people to volunteer as petition circulators on Election Day that year. The volunteers were posted at two hundred and eighty polling places selected for their potential fruitfulness based on information acquired from the Maine Audubon Society (which had obtained this data from the

Secretary).[9] The circulators succeeded in collecting a sufficient number of valid signatures on Election Day to qualify the measure for the ballot. Costs for the signature-collection phase of the campaign totalled $34,000.

24. The process by which initiative and referendum petitions are verified in Maine is not designed to detect fraud or forgeries in signature collection. Municipal registrars typically cross-check names on petitions against printouts or electronic lists of registered voters. They do not routinely cross-check against signature cards. The Secretary does not maintain a centralized file of signature cards. Nor does the Secretary check petitions for forgeries, although some are blatant; notably, cases in which one spouse signs on behalf of the other. The Secretary occasionally receives calls from municipal registrars or voters reporting suspected fraud, which it refers to the Office of the Attorney General for investigation.

25. As the verification process currently is structured, neither municipal registrars nor the Secretary would have adequate time to cross-check for forgeries. Municipal registrars have only five days within which to check petitions submitted on deadline; the Secretary has thirty days. Neither possesses expertise in handwriting analysis.

26. In the Secretary's view, the Statute is a necessary prophylactic measure designed to discourage a practice (that of paying per signature) that on its face is an

---

the petition. Once these signatures were invalidated, the measure fell short of garnering the required number of signatures.

**7.** These are An Act to Permit Medical Use of Marijuana and an Act to Ban Partial Abortion, which appeared on the November 1999 ballot, and An Act to Allow Video Lottery Terminals and the Maine Death with Dignity Act, which are slated to appear on the November 2000 ballot.

**8.** Some persons approached on the street to sign petitions do so despite the fact that they

are not registered voters. Circulators soliciting on the streets also have difficulty ensuring that people sign petitions keyed to their municipality of residence. Although Maine does not require that petitions be segregated by municipality, doing so is necessary as a practical matter because of the need to submit petitions to municipal registrars for verification.

**9.** The Secretary maintains data reflecting election turnout at polling places statewide.

inducement to commit fraud. The Secretary nonetheless has no evidence that there is a higher incidence of fraud or forgery when circulators are paid per signature than by any other method. No such data was collected either before or after passage of the Statute. Indeed, the Secretary is not provided with any information as to the methodology of payment of circulators of initiative and referendum petitions. To the Secretary's knowledge, no petition circulator in Maine who has been paid per signature has been prosecuted for forgery in connection with signature gathering.

27. There are disincentives for backers of initiative and referenda campaigns, such as USTL, to tolerate the commission of fraud or other irregularities in signature collection. Such practices could result, among other things, in the invalidation of signatures, in effect "stealing" from the state campaigns that USTL helps fund.

## II. Conclusions of Law

■ 1. The circulation of an initiative or referendum petition "involves the type of interactive communication concerning political change that is appropriately described as core political speech." *Meyer v. Grant*, 486 U.S. 414, 421–22, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (internal quotation marks omitted).

■ 2. A state may not, consistent with the First Amendment, severely burden such speech unless the regulation at issue is "narrowly tailored to serve a compelling state interest." *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 119 S.Ct. 636, 642 n. 12, 142 L.Ed.2d 599 (1999) (citation and internal quotation marks omitted); *see also Meyer*, 486 U.S. at 425, 108 S.Ct. 1886 (Colorado statute banning any payment to petition circulators "trench[ed] upon an area in which the importance of First Amendment protections is at its zenith"; accordingly, burden Colorado had to overcome to justify law "well-nigh insurmountable") (internal quotation marks omitted).

■ 3. A state's supposition that professional petition circulators are more likely to commit fraud than volunteers cannot carry its burden of proving that its regulation is narrowly tailored to meet a compelling need. *Meyer*, 486 U.S. at 426, 108 S.Ct. 1886; *see also Term Limits Leadership Council, Inc. v. Clark*, 984 F.Supp. 470, 475 (S.D.Miss.1997) (state failed to prove "actual fraud or threat to citizens' confidence in government posed by out-of-state circulators and/or circulators who are paid per signature.").

4. The Statute, in both its original form and as amended, has not had the effect of halting initiative and referendum activity in Maine. In addition, the plaintiffs made at best a modest effort to collect signatures during the Pledge Drive in 1997, employing thirteen people for a period of at most four weeks, foregoing a chance to collect signatures on Election Day and expending only a small fraction of their budget for payment to circulators. Had the plaintiffs worked harder and/or more creatively and invested more resources, the Pledge Drive might have succeeded despite the existence of the Statute.

5. I am nonetheless persuaded that the Statute severely burdened the plaintiffs' attempts to mount the Pledge Drive. USTL and OOT, like the plaintiffs in *Meyer*, had begun the process of collecting signatures when they made a judgment call, informed by personal experience with that process, that the state regulation in question posed a significant problem for their initiative campaign. The *Meyer* plaintiffs judged that they would need the assistance of paid personnel to obtain the required number of signatures within the allotted time. *Meyer*, 486 U.S. at 417, 108 S.Ct. 1886. USTL and OOT judged that the ban on payment per signature would undermine estimates of collection costs and time frames, threatening the success of the entire Pledge Drive effort. There was no need in either case for the plaintiffs to press their campaigns to completion to

demonstrate the burdensome effect of the applicable state regulation.

6. During the Pledge Drive campaign OOT encountered difficulty recruiting and keeping circulators when offering pay on an hourly basis. OOT and USTL had reason to believe, based on the personal experience of Jacob and Waters, that to the extent they were able to attract circulators to undertake this inherently stressful work, those workers would be less productive than if paid per signature. Finally, the Statute as worded left doubts in Michael's mind that he could ameliorate its effects by setting minimum standards or rewarding for productivity without subjecting himself to criminal prosecution.[10]

7. For these reasons the Statute "limit[ed] the number of voices who [would] convey [plaintiffs'] message[,] ... limit[ed] the size of the audience they [could] reach" and made it "less likely that [plaintiffs would] garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 422–23, 108 S.Ct. 1886.

8. The Statute, like the Colorado payment ban, did not completely stifle initiative and referendum activity in Maine, leaving open the possibility of conducting successful signature-gathering campaigns either via volunteers or employing "more burdensome" forms of paying professional circulators. *See id.* at 424, 108 S.Ct. 1886. That these avenues remained open does not alter the finding that the Statute heavily burdened protected speech. *Id.*

9. The Secretary has expressed a laudable determination to carry out its mission of protecting the integrity of the initiative and referendum process in Maine. The Secretary nonetheless, like the State of Colorado in *Meyer,* falls short of demonstrating that the Statute is narrowly tailored to meet a compelling state interest. The Secretary offers no evidence whatsoever that fraud is more pervasive among circulators paid per signature, or even that fraud in general has been a noteworthy problem in the lengthy history of the Maine initiative and referendum process. *Meyer* makes clear that, in the context of strict scrutiny, a state's assumptions cannot be accepted at face value.

In light of the foregoing, I conclude and declare that under controlling United States Supreme Court precedent the Statute, as applied to USTL, OOT and others similarly situated, violates the First Amendment.[11]

So ordered.

---

10. I interpret the Statute to prohibit only the practice of direct payment per signature; however, given the wording of its final sentence, which permits payment of "a salary that is not based on the number of signatures collected," I cannot say that Michael's interpretation is so far-fetched as to have rendered his concerns foolish or implausible.

11. I do not at this time grant injunctive relief inasmuch as I have been given no indication that the State will decline to comply with this court's declaratory judgment. If I am wrong, the plaintiffs are free to revisit the matter.