IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

AZ PETITION PARTNERS LLC d/b/a PETITION PARTNERS, an
Arizona limited liability company, *Petitioner*,

*v.*

THE HONORABLE PETER A. THOMPSON, Judge of the SUPERIOR
COURT OF THE STATE OF ARIZONA, in and for the County of
MARICOPA, *Respondent Judge,*

STATE OF ARIZONA, *Real Party in Interest.*

No. 1 CA-SA 21-0170
FILED 5-24-2022

Appeal from the Superior Court in Maricopa County
No.  CR 2020-000467-001
The Honorable Peter A. Thompson, Judge

**JURISDICTION ACCEPTED; RELIEF GRANTED IN PART**

COUNSEL

Mitchell Stein Carey Chapman PC, Phoenix
By Kathleen E. Brody, Lee D. Stein, Anne M. Chapman
*Co-Counsel for Petitioner*

Coppersmith Brockelman PLC, Phoenix
By Roopali H. Desai, D. Andrew Gaona
*Co-Counsel for Petitioner*

Arizona Attorney General's Office, Phoenix
By Linley Wilson, Todd C. Lawson
*Counsel for Real Party in Interest*

---

**OPINION**

Judge Michael J. Brown delivered the opinion of the Court, in which Presiding Judge Randall M. Howe and Judge Brian Y. Furuya joined.

---

**B R O W N**, Judge:

¶1        AZ Petition Partners, LLC ("Petitioner") seeks special action review of the superior court's denial of its two motions seeking dismissal of an Information charging multiple misdemeanor violations of A.R.S. § 19-118.01(A), which prohibits paying or receiving money "based on the number of signatures" collected for a statewide initiative or referendum. We accept jurisdiction and grant relief in part because the misdemeanor provision of § 19-118.01(B) violates the First Amendment.

**BACKGROUND**

¶2        In 2017, the legislature enacted § 19-118.01, which provides as follows:

> A. A person shall not pay or receive money or any other thing of value based on the number of signatures collected on a statewide initiative or referendum petition. Signatures that are obtained by a paid circulator who violates this section are void and shall not be counted in determining the legal sufficiency of the petition.
>
> B. A violation of this section is a class 1 misdemeanor.

¶3        Petitioner is a signature-gathering business that hires circulators to collect signatures on statewide initiative campaigns. *Molera v. Hobbs*, 250 Ariz. 13, 23, ¶ 28 (2020). In 2020, a political action committee hired Petitioner to collect signatures for the Invest in Education Act initiative. *Id.* at 18, 23, ¶¶ 2, 28. Petitioner compensated its circulators based on three pay scales, "which set an hourly rate and an expected average number-range of signatures to be gathered each hour." *Id.* at 23, ¶ 29. Circulators could fluctuate between the scales depending on their productivity for the prior week, along with other factors, including "the number of hours worked and how the circulators conducted themselves," but any adjustment to a circulator's hourly pay was prospective only. *Id.* Petitioner also offered several incentive bonus programs to circulators,

2

including the two at issue here as well as the spin-the-wheel program.[1]  *Id.* ¶¶ 28, 30, 31.

¶4            Opponents to the initiative filed a declaratory judgment complaint in superior court against the political action committee to disqualify the initiative from the ballot, alleging Petitioner's hourly rates and bonus incentive programs violated § 19-118.01(A).  *Id.* at 18, ¶ 3.  The court held that the hourly rates and the spin-the-wheel bonus program did not violate § 19-118.01(A).  *Id.* at 23, ¶ 31.  But the court also concluded that "four other incentive programs violated § 19-118.01(A)."  *Id.*  Both the political action committee and its opponents appealed to our supreme court, which affirmed in part and reversed in part the superior court's order.  *Id.* at 19, ¶ 5.  In doing so, the supreme court did not specifically analyze whether the four bonus programs, including the two here, violate § 19-118.01(A), because it found that even after removing the signatures obtained in violation of the statute, the initiative still had enough signatures to be placed on the ballot.  *Id.* at 27, ¶ 53.

¶5            Shortly after *Molera* was decided, the State filed a 50-count Information, alleging Petitioner violated § 19-118.01(A) by paying circulators "based on the number of signatures collected" through its "Weekend Warriors" and "Duel for the Dollars" bonus incentive programs.  Each count of the Information listed the name of a circulator who received a bonus payment and the amount of the payment, which ranged from $10 to $150 (except for Count One, which alleged a payment of $1200).

¶6            The State also filed an allegation of aggravating circumstances under A.R.S. § 13-803(F) (1), (4), and (7) (fines against enterprises), listing these factors: (1) "[t]he income and assets of the enterprise and the economic impact of the penalty on the enterprise"; (2) whether the offense led to pecuniary gain; and (3) "[t]he role of the directors, officers or principals of the enterprise in the offense."  The State's allegation of aggravating circumstances also cited A.R.S. § 13-823, which authorizes a court to deviate from the presumptive fine and impose up "to five times the maximum fine" if the court finds evidence of violation of a judicial or administrative order, the offense involved malicious or wanton conduct, or the offense involved conduct that posed an imminent and substantial hazard (or serious actual harm) to human health or the environment.  Thus, Petitioner faces a

---

[1]      This program "permitted circulators to spin a wheel for prizes each Monday when they turned in collected signatures.  The prizes ranged from $10 to $100, an extra hour of pay, or double these 'spins.'"  *Molera*, 250 Ariz. at 23, ¶ 30.

maximum fine of $5 million if convicted. *See* A.R.S. §§ 13-803(A)(2) (establishing a fine of not more than $20,000 for a class 1 misdemeanor offense); 13-823(A).

¶7 Petitioner moved to dismiss the charges under Arizona Rule of Criminal Procedure 16.4(b), challenging the legal sufficiency of the Information. Included in Petitioner's motion were transcript excerpts and the superior court's ruling from the declaratory judgment trial. Petitioner also included emails announcing the winners for the Duel for the Dollars and Weekend Warriors bonus programs and descriptions of how the Weekend Warriors program was promoted to circulators. Petitioner asserted that under its reading of *Molera*, § 19-118.01(A) bans only *per-signature* payments (a fixed rate for each signature) and thus payments to circulators under these two bonus programs do not violate the statute. Petitioner also noted that COVID-19 created several challenges to signature gathering and hampered its ability to timely account for the number of signatures each circulator had collected. Thus, according to Petitioner, payments under the two bonus programs were generally not tied to the number of signatures obtained by a circulator because the two bonus programs were not implemented as initially contemplated.

¶8 The State countered that dismissal was improper because the superior court would draw the same conclusion it did following the declaratory judgment trial in *Molera*—that the bonus programs violated § 19-118.01(A) because circulators were compensated, in part, based on the number of signatures collected. Referencing the superior court's ruling in *Molera*, the State explained that (1) "Weekend Warriors was available only to circulators who worked 20 hours during the week and 10-15 hours over the weekend while gathering at least three 'sets' of signatures per hour," and (2) "Duel for Dollars (sometimes referred to as Clash for the Cash) was a 'competition where two circulators duel head to head and see who can collect more signatures during the week. The winner received a cash prize.'" The court denied Petitioner's motion to dismiss based on the lack of an evidentiary record.

¶9 Petitioner then moved to dismiss a second time, asserting § 19-118.01 violates the First Amendment and is unconstitutionally vague and overbroad.[2] Alternatively, Petitioner argued that the statute is

---

[2] In compliance with A.R.S. § 12-1841, Petitioner served the Arizona Senate President and House Speaker with a notice of claim of unconstitutionality, but nothing in the record shows that either sought to participate in these proceedings.

constitutional only if narrowly construed to prohibit nothing more than per-signature payments. The court denied the motion, and this special action followed.

## DISCUSSION

**¶10** Special action jurisdiction is proper when a petitioner has no equally plain, speedy, or adequate remedy on appeal. Ariz. R.P. Spec. Act. 1(a). Review may also be appropriate when the petition presents purely legal questions of first impression and statewide importance. *Gilbert Prosecutor's Office v. Foster*, 245 Ariz. 15, 17, ¶ 5 (App. 2018). The State urges us to deny jurisdiction on the first motion to dismiss, which challenges the legal sufficiency of the Information. As for the second motion, given the constitutional issues at stake the State asks us to address the matter. In our discretion, and because courts should decide cases on non-constitutional grounds when possible, *State v. Payne*, 223 Ariz. 555, 561, ¶ 14 (App. 2009), we accept jurisdiction over the superior court's rulings on both motions.

## I.    Legal Sufficiency of the Information

**¶11** "On a defendant's motion, the court must order a prosecution's dismissal if it finds that the indictment, information, or complaint is insufficient as a matter of law." Ariz. R. Crim. P. 16.4(b). A charging document is insufficient as a matter of law if the "defendant can admit to all the allegations charged . . . and still not have committed a crime." *Mejak v. Granville*, 212 Ariz. 555, 556, ¶ 4 (2006). As it did in the superior court, Petitioner claims that under *Molera*, § 19-118.01(A) bans only per-signature payments and thus payments to circulators under the two bonus programs do not violate the statute.

**¶12** If the supreme court in *Molera* was inclined to construe the statute as solely prohibiting per-signature compensation, it would have said as much. Instead, the court specifically noted that it was not addressing the constitutionality of § 19-118.01, but found that the legislative history supported a "narrow" reading. *Molera*, 250 Ariz. at 25, ¶¶ 38–39 (reasoning that the legislature's "focus on eradicating the practice of per-signature payments, and its awareness of the constitutional implications of restricting other circulator compensation methods, demonstrate it intended a narrow application of the term 'based on'"). The court then held that § 19-118.01 bars compensation structures where a circulator's pay "is dependent on or calculated by, *in whole or in part*, the number of signatures collected during the compensation period." *Id.* at 24, ¶ 35 (emphasis added). Thus, payments "per signature, per completed signature sheet, or

by an hourly, daily, or weekly rate that is contingent on collecting a specified number of signatures" are prohibited under § 19-118.01(A). *Id.* The court also concluded, however, that "prospective adjustment to hourly rates in light of a circulator's past productivity" does not violate the statute. *Id.* at 25, ¶ 41. Under our supreme court's interpretation of § 19-118.01(A), the two bonus programs at issue here allegedly violate § 19-118.01(A) because they purportedly paid circulators "in whole or in part" based on the number of signatures collected.

¶13 Petitioner also argues the superior court erred by finding that an evidentiary record is necessary to resolve the first motion to dismiss. According to Petitioner, the legislature did not intend to criminalize the conduct alleged in the Information, as its circulators were not paid per signature, but were merely rewarded for productivity alongside their hourly wages.

¶14 In *Molera*, the supreme court affirmed the superior court's finding that the spin-the-wheel bonus program did not violate § 19-118.01 because the initiative opponents did not show that circulators had to submit a certain number of signatures to spin the wheel. 250 Ariz. at 25, ¶ 42. Although the program was advertised as giving the circulator an additional chance to spin depending on how many signatures he or she had obtained, the supreme court found that if the program had operated that way, then whether § 19-118.01 was violated "would be a closer question. But the evidence at trial showed that a circulator did not have to collect any number of signatures to spin the wheel." *Id.* at 26, ¶ 43.

¶15 Unlike the circumstances in *Molera*, we do not have an evidentiary record before us to determine whether the two bonus programs violate § 19-118.01(A). Petitioner relies on evidence presented to the superior court in the *Molera* case for its argument that the bonus programs, as advertised, do not violate § 19-118.01(A). But nothing in this special action record would permit us to make a legal determination on whether the execution of the bonus programs violated § 19-118.01(A) sufficient to qualify as proof beyond a reasonable doubt. The materials Petitioner included in its first motion to dismiss were presented to a different judge and parties with a lower standard of proof in a civil proceeding. We lack a fully developed record, with evidence from both parties and the opportunity for cross-examination of witnesses, to determine whether the bonus programs operated in such a way that circulators were paid "based on the number of signatures collected." And, by its own admission, Petitioner intends to dispute certain facts at trial. The superior court did not abuse its discretion in denying the first motion to dismiss.

## II.    Constitutionality of Section 19-118.01(A)

¶16    Petitioner argues that § 19-118.01 implicates First Amendment rights and must be narrowly interpreted to mean only a prohibition on per-signature compensation to avoid burdening those rights. When our supreme court interpreted § 19-118.01(A), it expressly did not address the statute's constitutionality. *Molera*, 250 Ariz. at 25, ¶ 38. We do so now.

¶17    We review the constitutionality of a statute de novo. *State v. Arevalo*, 249 Ariz. 370, 373, ¶ 9 (2020). "An act of the legislature is presumed constitutional, and where there is a reasonable, even though debatable, basis for enactment of the statute, the act will be upheld unless it is clearly unconstitutional." *Id.* (citation and quotation omitted). Given the strong presumption that a statute is constitutional, the challenging party has the burden to prove otherwise. *Id.*

### A.    Standard of Review

¶18    The Arizona Constitution preserves the right of the people to propose laws through the initiative process. Ariz. Const. Art. IV, pt. 1, § 1(1)–(2). Ten percent of all qualified electors (defined as the "number of votes cast for all candidates for governor at the general election last preceding the filing of any initiative"), *id.* § 1(7), are required to propose an initiative measure for the ballot, *id.* § 1(2).

¶19    Petition circulation "involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). "The First Amendment protects [a petitioner's] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id*. at 424. Circulators serve a crucial role in the petition process because they must "express the petitioner's desire for political change" and "discuss the merits of the proposed change." *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 383 (6th Cir. 2008).

¶20    As explained in *Meyer*, restrictions on circulator pay inhibit political expression because they reduce (1) the number of circulators who participate in the initiative process in a way that limits the size of the audience an initiative proponent might reach, and (2) the likelihood that the proponent's measure will land on the ballot and become a matter of statewide discussion. 486 U.S. at 422–23. But the government also has a substantial interest in regulating elections to maintain fairness and honesty in "the democratic process," and the right to engage in the initiative process

is therefore "not absolute." *Arizonans for Second Chances, Rehab., & Pub. Safety v. Hobbs*, 249 Ariz. 396, 408, ¶ 41 (2020) (citation and quotation omitted); *see Storer v. Brown*, 415 U.S. 724, 730 (1974) (recognizing "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes").

**¶21**       For state election laws that create barriers to the political process, the Supreme Court has rejected any "litmus-paper test" to determine the appropriate standard of review. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (citation and quotation omitted); *see also Burdick v. Takushi*, 504 U.S. 428, 432–33 (1992). Instead, a flexible framework is used to determine the standard of review for ordinary election laws, *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995), where courts balance the burden imposed on the challenger's First Amendment rights against the state's interests offered to justify that burden, *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. Courts then evaluate the "legitimacy and strength" of the state's interests and whether they are necessary to burden the plaintiff's rights. *Anderson*, 460 U.S. at 789. Although Petitioner suggests that strict scrutiny should presumptively apply here, our supreme court has recognized that the *Anderson/Burdick* framework governs constitutional challenges for "all ballot access restrictions." *Arizonans for Second Chances*, 249 Ariz. at 408–09, ¶¶ 41–42 ("Ballot access restrictions implicate the right to vote and the related right to associate with others to advance shared political beliefs.").

### B.    *Anderson/Burdick* **Framework**

**¶22**       Under the *Anderson/Burdick* framework, we weigh the "severity of the burden on a plaintiff's First and Fourteenth Amendment rights to determine the level of scrutiny to apply." *Id.* at 409, ¶ 42; *McIntyre*, 514 U.S. at 336 n.1 ("The term 'liberty' in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States."). If a statute imposes a "severe burden," the statute must be "narrowly tailored to advance a compelling state interest." *Arizonans for Second Chances*, 249 Ariz. at 409, ¶ 42 (citation and quotation omitted). If a statute imposes a "reasonable, nondiscriminatory restriction[]," it triggers a "less exacting review" and "may be justified by the state's important regulatory interests." *Id.* (citations and quotations omitted). Generally, the question of the severity of the burden a statute imposes is "fact-intensive." *See Deters*, 518 F.3d at 383.

¶23        Assuming the truth of the State's allegations, Petitioner did pay circulators (at least in part) "based on" the number of signatures collected through the Weekend Warriors and Duel for the Dollars bonus programs. As alleged by the State, and depending on the details of how the programs were actually carried out, those payments would therefore violate § 19-118.01. *See Molera*, 250 Ariz. at 27, ¶ 53 (noting that the superior court "correctly disqualified only signatures collected by circulators during the pay periods in which they were paid bonuses that violated § 19-118.01(A)"). In the context of this criminal prosecution, we consider whether § 19-118.01, and especially the misdemeanor provision of subsection (B), severely burdens the First Amendment rights of initiative proponents who rely on paid circulators to gather signatures.

¶24        Petitioner argues that, as construed by *Molera*, the statute imposes a severe burden on First Amendment rights that requires us to apply exacting review. Petitioner first points to the fact that over the last 30 years, no statewide initiative measure has been placed on a ballot in Arizona without the work of paid circulators, which the State does not dispute. Nor does the State dispute Petitioner's assertion that recruiting circulators became more challenging after the enactment of § 19-118.01.

¶25        The State counters that § 19-118.01 is a reasonable restriction and should be subject to a less exacting review. According to the State, because § 19-118.01 prohibits only "one type of payment to circulators" that is "based on the number of signatures collected," the statute (1) does not decrease the available pool of circulators, (2) places only a minimal burden on Petitioner's First Amendment rights, and (3) imposes no burdens on circulators. But the State's argument overlooks *Molera*'s analysis of what types of compensation the statute permits and fails to account for the risks of criminal sanctions if the statute is violated. Nor does the State cite any case upholding, against a First Amendment challenge, circulator compensation restrictions equivalent to those outlined in *Molera*. Instead, the State relies on caselaw interpreting similar statutes from four other jurisdictions, asserting no material difference exists between § 19-118.01 and the statutes at issue in those cases. *See Prete v. Bradbury*, 438 F.3d 949, 963–71 (9th Cir. 2006); *Person v. N.Y. State Bd. Of Elections*, 467 F.3d 141, 143–44 (2d Cir. 2006); *Initiative & Referendum Instit. v. Jaeger*, 241 F.3d 614, 616–18 (8th Cir. 2001); *Pierce v. Stapleton*, 505 F. Supp. 3d 1059, 1068–76 (D. Mont. 2020).

¶26        Those four cases are distinguishable from this criminal prosecution. In each case, the regulation at issue prohibited paying circulators based on the number of signatures collected but left open other

methods of circulator payment. *Person*, 467 F.3d at 143; *Jaeger*, 241 F.3d at 616; *Prete*, 438 F.3d at 952; *Pierce*, 505 F. Supp. 3d at 1062. In fact, in *Prete* the court held that the statute at issue did "not prohibit adjusting salaries or *paying bonuses* according to validity rates or productivity." 438 F.3d at 968 (emphasis added). The courts in each case applied the less exacting standard of review and found that the state's important regulatory interests were sufficient. *Person*, 467 F.3d at 143–44; *Jaeger*, 241 F.3d at 618; *Prete*, 438 F.3d at 969–71; *Pierce*, 505 F. Supp. 3d at 1075.[3] Although the statutory wording in each case generally aligned with § 19-118.01, the reviewing courts made it clear they were analyzing the respective statutes with the understanding that they precluded "per signature payments." *Person*, 467 F.3d at 143 (finding "insufficient support for a claim that the ban on per-signature payment is akin to the complete prohibition on paying petition circulators"); *Jaeger*, 241 F.3d at 618 (noting the state presented sufficient evidence to justify a per-signature ban because the legislative history revealed irregularities and fraud in two signature campaigns where circulators were paid per-signature); *Prete*, 438 F.3d at 969–71 (considering evidence that per-signature payments result in two types of fraud: forgery and false certifications); *Pierce*, 505 F. Supp. 3d at 1075 (recognizing that initiative proponents can still pay circulators "on a daily basis, a monthly basis, by the job, by salary, or would be free to adjust salaries based upon a circulator meeting certain benchmarks or validity rates" and circulators may still receive bonuses "even if payment per signature is not allowed").

¶27 Alternatively, Petitioner argues that if we accept the State's reading of *Molera*—that § 19-118.01 restricts more than per-signature payments—then the statute imposes a severe burden on First Amendment rights. Courts in other jurisdictions have applied "exacting scrutiny" in reviewing statutes that eliminate all or most payment methods. *See, e.g., Deters*, 518 F.3d at 388; *accord Indep. Inst. v. Gessler*, 936 F. Supp. 2d 1256,

---

[3] The statutes at issue in *Jaeger, Prete, Person,* and *Pierce* were not upheld as constitutional solely because they prohibited only one method of circulator compensation. Rather, the courts looked at the evidence presented by the parties challenging the statute to establish the severity of the burden, and the state's evidence to support its compelling interest. *See, e.g., Jaeger*, 241 F.3d at 618 (noting that "bare assertions" of a burden on First Amendment rights may be sufficient when the state does not offer any evidence to support its regulatory interest, but "when the state introduces evidence justifying the ban on commission payments as a necessary means to prevent fraud and abuse . . . initiative sponsors may not rest on bare assertions alone").

1259, 1277 (D. Colo. 2013) (applying heightened scrutiny to a statute making it unlawful for more than 20% of a circulator's compensation to be based on the number of signatures collected); *Res. Dev. Council for Alaska, Inc. v. Vote Yes for Alaska's Fair Share*, 494 P.3d 541, 552–53 (Alaska 2021) (applying exacting review to a statute that placed a "hard cap on circulator compensation").  In these cases, the reviewing courts found the challenged statutes were unconstitutional.  *See, e.g.*, *Deters*, 518 F.3d at 388; *Gessler*, 936 F. Supp. 2d at 1279–80; *Vote Yes*, 494 P.3d at 553.[4]  Section 19-118.01 is analogous to the statute in *Deters*, where an Ohio statute made it a felony to pay circulators on any basis other than time worked.  518 F.3d at 377.  In *Deters*, the court found that "the per-time-only provision adds an element of risk to the petition process which would otherwise be absent."  *Id*. at 384.  The court reasoned that the statute there was subject to exacting review based on "the broader ban on the types of payment and harsher criminal sanctions for violations."  *Id*. at 386.  Similarly, § 19-118.01, as construed by *Molera*, bans more types of payments than just per-signature compensation.  And, as discussed below, § 19-118.01(B) includes criminal penalties for violations, which subject the statute to a more exacting standard of review.

### 1.    Severity of the Burden

¶28        Petitioner argues the criminal penalties of § 19-118.01(B) place a significant burden on First Amendment rights.  The State counters that criminal penalties are a minor burden that do not limit the pool of available circulators.  The existence of criminal penalties, however, makes the need for a more exacting standard of review particularly appropriate.

¶29        The State charged Petitioner with 50 counts of violating §§ 19-118.01(A) and 13-305 (criminal liability for enterprises), and it alleged aggravating circumstances under §§ 13-803(F) and 13-823.  Noting that the presumptive fine for an enterprise is $10,000, the State argues that exposure to such a fine does not increase the burden because the fine is limited only to enterprises, is "not mandatory," and is subject to the superior court's discretion.  However, while the provisions of § 13-803 may be limited to enterprises, the express language of § 19-118.01(B) states that all "person[s]"

---

4        Several courts have held that statutes banning *per-signature* compensation for circulators violate the First Amendment.  *On Our Terms '97 PAC v. Sec'y of State of Me.*, 101 F. Supp. 2d 19, 26 (D. Me. 1999); *Term Limits Leadership Council, Inc. v. Clark*, 984 F. Supp. 470, 470–71, 475 (S.D. Miss. 1997); *Limit v. Maleng*, 874 F. Supp. 1138, 1140–42 (W.D. Wash. 1994).  We do not address that issue because Petitioner does not make that argument.

who violate its strictures are subject to prosecution of a class 1 misdemeanor. This includes individual circulators, as § 19-118.01 criminalizes both providing *and receiving* compensation based on the number of signatures. In any event, the State also alleged aggravating circumstances, thereby allowing the court to increase the maximum fine for Petitioner to $20,000 on each count. *See* A.R.S. § 13-803(A)(2), (F). Furthermore, Petitioner is potentially liable for a maximum of $5 million in fines, even though the total of all the bonus payments it allegedly made to circulators is $4,740. *See* A.R.S. § 13-823 (authorizing imposition of up "to five times the maximum fine" for dangerous and repeat enterprise offenders).

¶30　　　　The State also contends that a misdemeanor should be considered a low-level petty offense because it does not generally trigger a jury trial. But the State cites no authority suggesting that jury-trial eligibility is a relevant factor in deciding whether the threat of a criminal sanction for violating a statute imposes a severe burden under First Amendment analysis. Moreover, we reject the State's assertion that a class 1 misdemeanor constitutes a petty offense. *See* A.R.S. § 13-602(C) ("Every petty offense in this title is expressly designated as such. Any offense defined outside this title without either designation as a felony or misdemeanor or specification of the classification or the penalty is a petty offense."). Section 19-118.01(B) plainly defines the offense as a class 1 misdemeanor, punishable by up to six months imprisonment, plus fines. *See* A.R.S. § 13-707(A)(1). Even as a misdemeanor, although a circulator who receives any payment in violation of § 19-118.01 is not subject to the heavier fines applicable to enterprises, he or she still faces those fines applicable to individuals and the possibility of imprisonment.

¶31　　　　The mere possibility of substantial fines for enterprises, along with fines and possible jail time for circulators, weighs in favor of finding that § 19-118.01(A) imposes a severe burden on Petitioner's First Amendment rights. *See Meyer*, 486 U.S. at 421 (noting that the issue of trucking industry deregulation was a matter of societal concern that initiative proponents had "a right to discuss publicly without risking criminal sanctions"). Even though a violation of § 19-118.01(A) is classified as a misdemeanor, this case shows that a misdemeanor offense can still be severely burdensome on the rights of enterprises and circulators seeking to express their desires for political change. *See id*. at 421 ("The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." (citation and quotation omitted)).

¶32　　　　Petitioner also argues that if § 19-118.01 "is interpreted as a strict-liability crime, as the State has urged,[] its burden on First Amendment rights is even greater."　The State counters that the omission of a mens rea, or mental state, requirement from the statute "has nothing to do with the severity of the burden."　It contends that this issue is relevant only as to Petitioner's vagueness challenge, and if it is necessary to address that challenge, then we "should hold that the statute implies a knowing requirement instead of striking it down."

¶33　　　　While no court has considered the relevance of a mental state requirement under the A*nderson/Burdick* framework, it is likely because the issue has never been raised in the context of a criminal prosecution. Regardless, we reject the State's assertion that when the legislature imposes criminal liability for violation of a statute that restricts circulator compensation, the lack of a required mental state is irrelevant.　Without a mental state requirement, it is undoubtedly easier to obtain a conviction. Indeed, an offense not requiring proof of a culpable mental state is referred to by statute as "one of strict liability."　*See* A.R.S. § 13-202(B).　Because signature-gathering firms and circulators are subject to the criminal penalties described above, those who might otherwise desire to work as paid circulators may decline to participate for fear of criminal prosecution, and firms that pay such circulators may be less inclined to offer any type of incentive that is based on productivity.　Either of those results would significantly undermine First Amendment protection.　*See Meyer*, 486 U.S. at 425 (explaining that a Colorado statute prohibiting circulator compensation "trenches upon an area in which the importance of First Amendment protections is 'at its zenith'").

¶34　　　　The State's suggestion that we should impute a knowing requirement to allow the statute to withstand a vagueness challenge is untenable.　As worded by the legislature, the statute does not include any mental state requirement and nothing in *Molera* suggests otherwise.　*See* 250 Ariz. at 24, ¶¶ 28–30 (discussing Petitioner's pay scales).　There is nothing to indicate that, at the *Molera* declaratory judgment trial, the standard the trial court used in assessing whether signatures were invalid was based on anything other than the statute's plain wording, without regard to whether Petitioner knowingly paid circulators in violation of the statute.　It would be odd then for us to conclude that the meaning of the statute should be read differently, to include a mental state requirement, in dealing with the criminal charges here.

### 2. State's Interests

¶35        The State argues that under either standard of review, its interest in preventing fraud is sufficient to justify any burden on First Amendment rights.  The State urges us to defer to the following legislative findings:

> 2. Protecting the integrity of the initiative process through the prevention of fraud is a significant state interest.
>
> 4. "There is some consensus among scholars, practitioners, and even some courts that the practice of paying canvassers based on the number of signatures they collect is directly linked to high levels of fraud in the signature-gathering process." Jocelyn Friedrichs Benson, *Election Fraud and the Initiative*, 34 FORDHAM URB. L.J. 889, 923 (2007).
>
> 5. To reduce fraud in the signature collecting process, states have enacted prohibitions on payment per signature.
>
> 6. "[A]vailable evidence—though limited—suggests that circulators paid by the hour [] have a higher validity rate than those paid by the signature." Affidavit of Richard J. Ellis, Ph.D. at ¶ 5, Prete v. Bradbury, No. 036357-AA, 2004 U.S. Dist. LEXIS 28738 (D. Or. Feb. 18, 2004), aff'd, 438 F.3d 949 (9th Cir. 2006).

2017 Ariz. Legis. Serv. Ch. 52, § 5(A) (1st Reg. Sess.) (H.B. 2404) ("Legislative findings; purpose").

¶36        Findings 5 and 6 are not compelling because they specifically reference *payment per signature*.  As noted above, § 19-118.01 is more restrictive.  As to Findings 2 and 4, the Supreme Court has advised courts against assuming professional circulators will engage in fraud when their "qualifications for similar future assignments may well depend on a reputation for competence and integrity." *Meyers*, 468 U.S. at 426.  Thus, the legislature's mere assertions of fraud, with no specific proof that it occurred in the context of signature gathering in Arizona, do not qualify as the type of evidence courts have generally recognized in considering whether the government has met its burden.  *See Deters*, 518 F.3d at 387 (requiring evidence in the record to support the state's interest in combatting fraud, and to show causation between payment per signature and any fraudulent acts); *Gessler*, 936 F. Supp. 2d at 1278–79 (finding that

the legislature's findings are not entitled to deference in the context of a First Amendment challenge).

¶37 Moreover, the State can satisfy its legitimate interests in reducing fraud in the initiative process through other measures. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 204–05 (1999) (noting that voiding signatures obtained in violation of circulation laws and criminalizing forgery are "less problematic measures" by which a state can meet its "substantial interests in regulating the ballot-initiative process"); *see also Deters*, 518 F.3d at 388. Consistent with the Supreme Court's analysis in *Buckley*, 525 U.S. at 204–05, Arizona has "an arsenal of safeguards" to support its substantial interest in regulating the initiative process, including laws criminalizing election fraud and forgery. *See, e.g.,* A.R.S. §§ 13-2002 (forgery); 19-112 (requiring circulators to submit affidavits for each sheet of signatures); 19-114.01 (prohibition on signing petition for profit); 19-115(B) (making it an unlawful act for a person to sign a petition with a name other than his own); 19-119.01 (petition signature fraud). And, of course, signatures obtained in violation of Arizona's initiative process laws are void and thus not counted toward the validity of an initiative. *See, e.g.,* A.R.S. § 19-118.01(A).

¶38 Finally, it seems plain to us that signature-gathering businesses approach their tasks hoping to meet their clients' objectives to succeed by placing issues on the ballot, which means avoiding any violation of the law that would undermine those objectives. Put another way, because Petitioner has a strong incentive in obtaining valid signatures to achieve successful placement on the ballot, that incentive undercuts the State's broad assertions that imposing a criminal penalty for violating compensation restrictions reduces fraud. *See Meyer*, 486 U.S. at 425 (noting "the burden that [the government] must overcome to justify this criminal law is well-nigh insurmountable"). After consideration of these factors under the A*nderson/Burdick* framework, we conclude that § 19-118.01 is subject to a more exacting review because it severely burdens the initiative process.

### 3. Exacting Review

¶39 Having identified the exacting review as applicable here, we now address whether § 19-118.01 is narrowly tailored to advance the State's compelling interest in combatting fraud in the initiative process. *See Arizonans for Second Chances*, 249 Ariz. at 409, ¶ 42. The State contends its interest in combatting fraud in the initiative process meets this higher standard of review. Although the State seems to concede that legislative

findings do not constitute actual "evidence," the State rejects the notion that it must present actual evidence of fraud to justify its asserted interest. We disagree with this interpretation of the *Anderson/Burdick* framework.

¶40　　　To properly evaluate the legitimacy and strength of the State's interest in burdening First Amendment rights, it must provide some evidence that the burdensome restriction is necessary. A general statement of the legislature's purpose or findings is not enough for us to review whether the State's interests are legitimate or sufficient under the more exacting standard of review. *See Meyer*, 486 U.S. at 426 (rejecting the state's argument that circulator compensation may lead to fraud, where no evidence was "offered to support that speculation"). Although the State references issues arising in 2008 where signatures collected for several initiatives were determined invalid, it does not explain how the invalid signatures, without more, necessarily means that fraudulent activity occurred or how circulator compensation was a contributing factor.

¶41　　　For these reasons, the State's interest in the criminal penalties authorized by subsection (B) is not narrowly tailored. Thus, the State has not justified the burden it has placed on those seeking to collect signatures for an initiative petition by criminalizing any violation of § 19-118.01. We therefore hold that the misdemeanor provision of the statute is unenforceable because it violates the First Amendment.

## C.　Severability

¶42　　　The law concerning the severability of statutes is "well settled." *Millett v. Frohmiller*, 66 Ariz. 339, 342 (1948). We need not declare § 19-118.01 unconstitutional if the unconstitutional portion can be severed. *State v. Prentiss*, 163 Ariz. 81, 86 (1989). Whether a statute is severable is a "question of legislative intent." *State v. Watson*, 120 Ariz. 441, 445 (1978).

¶43　　　The general test for whether a statute can be severed is whether the unconstitutional provision is connected and interdependent on the rest of the statute. *Millett*, 66 Ariz. at 342–43. A statute is not severable "where the constitutional and unconstitutional provisions are so connected and interdependent in subject matter, meaning, and purpose as to preclude the presumption that the legislature would have passed the one without the other," and "justify the conclusion that the legislature intended them as a whole." *Id.* at 343. If the court severs a portion of the statute, the "law enforced after separation must be reasonable in light of the act as originally drafted." *Id.*

**¶44**     The misdemeanor provision in § 19-118.01(B) violates the First Amendment but can properly be severed to save the rest of the statute. *Cf. Flamingo Paradise Gaming, LLC v. Chanos*, 217 P.3d 546, 561 (Nev. 2009) (holding that the criminal penalties portion of a statute can be properly severed if the statute is unconstitutionally vague in a criminal context). The structure of § 19-118.01 supports the conclusion that the misdemeanor provision is separate and distinct from the rest of the statute. We can fairly conclude that the legislature would have adopted section A without section B and find support for doing so from the legislature's own severability clause accompanying the house bill enacting § 19-118.01. *See* 2017 Ariz. Legis. Serv. Ch. 52, § 6 ("If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable."). We see no reason why the statute as interpreted by our supreme court cannot survive our analysis here. Thus, in reaching this conclusion we are not addressing whether the rest of the statute is constitutional.

**¶45**     Because we conclude that the criminal penalty provision is unenforceable, we need not address Petitioner's arguments that § 19-118.01 is unconstitutionally vague or overbroad, or that the rule of lenity should apply.

## III.     Attorneys' Fees

**¶46**     Petitioner requests attorneys' fees under A.R.S. § 12-348(A)(4) and Arizona Rule of Procedure for Special Actions ("Rule") 4(g). The State objects, asserting that Petitioner cannot recover fees because the underlying criminal proceedings were brought under provisions of title 13. *See* A.R.S. § 12-348(H)(2) (barring an award of fees for "proceedings brought by this state pursuant to title 13 or 28"). "We interpret statutory language in view of the entire text, considering the context and related statutes on the same subject." *Nicaise v. Sundaram*, 245 Ariz. 566, 568, ¶ 11 (2019). Our goal in statutory interpretation is to "give effect to the legislature's intent." *State v. Jurden*, 239 Ariz. 526, 530, ¶ 15 (2016). If the text is unambiguous, we apply it as written without using other methods of statutory interpretation. *Id.* We apply the same principles of statutory construction to interpreting our rules. *State v. Hansen*, 215 Ariz. 287, 289, ¶ 7 (2007).

**¶47**     Section 12-348(A)(4) states that "a court shall award fees and other expenses to any party . . . that prevails by an adjudication on the merits in . . . [a] special action proceeding brought by the party to challenge

an action by this state or a city, town or county against the party." Section 12-348(A)(4) "does not . . . [a]pply to proceedings brought by this state pursuant to title 13 or 28." A.R.S. § 12-348(H)(2). Rule 4(g) states: "In *any* special action, a party may claim costs and attorneys' fees as in other civil actions." (Emphasis added.)

**¶48** The State argues that § 12-348(H)(2) prohibits Petitioner's ability to recover fees because the underlying criminal proceedings were brought under A.R.S. §§ 13-301; -302; -303; -304; -305; and -803. But this action was not brought under title 13; the charges were filed under title 19. Petitioner was not charged for violating any section of title 13 or 28, and the State's sentencing allegations under title 13 would be irrelevant without the underlying title 19 charge. If the legislature wanted to create an exception for *all* criminal prosecutions, it could have included language to that effect in § 12-348. Instead, the legislature excepted only prosecutions brought under title 13 and title 28, and it is not our role to question that decision. *See Giss v. Jordan*, 82 Ariz. 152, 159 (1957) (noting that the legislature alone decides "questions of the wisdom, justice, policy or expediency of a statute"). Reading the legislature's directives in § 12-348 together with the supreme court's decision to authorize an award of attorneys' fees in *any* special action, Rule 4(g), we hold that a petitioner in a special action proceeding who successfully challenges an action by the government that does not arise out of title 13 or 28 is entitled to seek attorneys' fees.

**¶49** Nonetheless, the State contends that § 12-348(H)(2) has been construed to prohibit attorneys' fees "incurred in connection with a special action in a criminal prosecution." *See Mields v. Villarreal*, 159 Ariz. 556, 557 (App. 1989). We are not persuaded. In *Mields*, the defendant was charged with driving while intoxicated under title 28. *Id.* After a city magistrate denied the defendant's motion to dismiss, he sought special action relief in the superior court, asserting the magistrate erred by denying his request for oral argument and by refusing to allow him to file a reply in support of his motion. *Id.* at 557–58. The superior court remanded the case and awarded attorneys' fees to the defendant. *Id.* at 558. The State appealed to this court, where the defendant asserted the fee award was proper under § 12-348. *Id.* at 559. We vacated the award, explaining in part that the defendant failed to recognize that § 12-348 does not apply to proceedings brought by a city under title 28. *Id.* Unlike *Mields*, the criminal charges here were not filed under title 13 or 28.[5] We therefore grant Petitioner's request for reasonable

---

[5] The State also relies on *State v. Shipman*, 208 Ariz. 474, 476 (App. 2004), for the proposition that Rule 4(g) bars an award of attorneys' fees for special

attorneys' fees incurred in this special action, subject to compliance with Rule 4(g) and ARCAP 21.

## CONCLUSION

**¶50** Section B of A.R.S. § 19-118.01 is unconstitutional because it violates the First Amendment. We therefore reverse the superior court's order denying Petitioner's second motion to dismiss and remand for dismissal of the Information.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

actions arising from criminal proceedings. But *Shipman* is not helpful because it addressed a different issue—whether Arizona Rule of Civil Procedure 11 was applicable in a special action arising out of a criminal proceeding. *Id.* at 474, ¶ 1.